UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:14-CV-359-TBR

GLORIA MARSHALL                                                    Plaintiff

v.

THE RAWLINGS COMPANY, LLC, *et al.*                               Defendant


**MEMORANDUM OPINION**

This matter comes before the Court upon Defendant The Rawlings Company, LLC's Motion for Summary Judgment. (Docket No. 34.) Plaintiff Gloria Marshall has responded, (Docket No. 37), and Defendant has replied, (Docket No. 40). Fully briefed, this matter is ripe for adjudication. For the reasons enumerated below, the Court will GRANT Defendant's Motion.

**Background**

The Defendant The Rawlings Company, LLC ("Rawlings") provides "sophisticated data mining and recovery services to health insurance carriers." (Docket No. 34-1 at 2.) According to Rawlings, it "has several divisions, including Subrogation, Workers' Compensation ("Workers Comp"), Audit, and Support." *Id.*

In January 2006, Rawlings hired Ms. Marshall as a Workers' Compensation Analyst. (Docket Nos. 34-1 at 3; 37 at 3.) While an employee at Rawlings, Ms. Marshall received a base salary as well as incentive pay. (Docket Nos. 34-1 at 3; 37 at 3.) As part of his or her incentive pay, an analyst receives "a percentage of the fees paid to medical providers that an analyst manages to recover back for Rawling's clients." (Docket No. 37 at 3; *see also* Docket No. 34-1 at 3-4.) An analyst also receives incentive pay for the number of recovery checks Rawlings receives as a result of the analyst's efforts. (Docket Nos. 34-1 at 4; 37 at 3.) Rawlings states that

1

the purpose of incentive pay is to "ensure analysts are working all of their files, turning inventory, and making sure the files either reach a successful conclusion, or move the file out of the inventory because there is no recovery opportunity." (Docket No. 34-1 at 4.) Those files that have no recovery opportunity are referred to as a "no recovery" or "NR" files. *Id.*

In September 2011, Rawlings promoted Ms. Marshall to the position of "Team Lead." (Docket Nos. 34-1 at 4; 37 at 3.) Ms. Marshall notes that upon her promotion to Team Lead, she received a higher base salary and "had the opportunity to get a bonus based on the work of the analysts on her team." (Docket No. 37 at 3.) Rawlings contends that as a Team Lead, Ms. Marshall's "primary objective was to coach, mentor, and train analysts to achieve an optimal generation of recoveries." (Docket No. 34-1 at 4.) Additionally, Rawlings states that Ms. Marshall's responsibilities as a Team Lead included having to review the no recovery files of the analysts on her team and continuing to manage her own files. *Id.*

Ms. Marshall and all of her fellow Team Leads reported to Leah Sarley who was promoted shortly after her to the position of Team Operations Manager. (Docket Nos. 34-1 at 4; 37 at 4.) Mike Elsner, Division Director for the Workers' Comp Division, indirectly supervised Ms. Marshall and the other Team Leads. (Docket Nos. 34-1 at 4; 37 at 4.)

A few months after her promotion, Ms. Marshall took several non-FMLA sick days. (Docket Nos. 34-1 at 4; 37 at 3.) According to Ms. Marshall, she suffers from depression, anxiety and post-traumatic stress disorder. (Docket No. 37 at 3.) She alleges that she told Mr. Elsner who directly supervised the Team Leads prior to Ms. Sarley's promotion that she was "having issues with her anxiety and the medication that she was taking for her disorders" at the time that she had to take several sick days. (Docket No. 37 at 4.) Ms. Marshall contends that these issues and sick days "did not impact her job performance." (Docket No. 37 at 3-4.)

2

Alternatively, Rawlings argues that "[t]here are a number of reports . . . indicating [that Ms. Marshall] was already behind on her individual files before she took family and medical leave in 2012." (Docket No. 34-1 at 5.)

On February 7, 2012, Ms. Marshall took her first leave under the Family Medical Leave Act ("FMLA") due to her mental health issues. (Docket Nos. 34-1 at 5; 37 at 4.) Rawlings processed Ms. Marshall's FMLA leave request and Ms. Marshall communicated with Ms. Sarley and Mr. Elsner about her status. (Docket Nos. 34-1 at 5; 37 at 4.) While Ms. Marshall was out on FMLA leave, no new files were assigned to her and another employee, Jason Sawyer, was assigned to temporarily cover Ms. Marshall's responsibilities as a Team Lead. (Docket Nos. 34-1 at 4-5; 37 at 4-5.) On either March 12 or 13, 2012, Ms. Marshall returned to work. (Docket Nos. 34-1 at 6; 37 at 7.) According to Rawlings, Ms. Marshall had a backlog of files and she remained off of the rotation to receive new files for several months so that she could catch up on the files that had remained stagnant during her leave. (Docket No. 34-1 at 6.) Rawlings contends that Jason Sawyer and Ms. Sarley continued to assist Ms. Marshall with some of her daily responsibilities when she returned to work. (Docket No. 34-1 at 6.) Ms. Marshall, however, cannot recall Jason Sawyer providing any assistance in particular upon her return to work and questions whether Sarley provided any help either. (Docket No. 37 at 7.)

Ms. Marshall reports that she "felt isolated" upon returning to work after her FMLA leave. *Id.* She claims that an analyst and friend, Doug Gurley, told her that another Team Lead, Chris Gardner, had suggested to him that he stop going to lunch with Ms. Marshall or spending time with her during work breaks. *Id.* Ms. Marshall also contends that Beth Davidson, another Team Lead, told her that during a Team Lead meeting during her leave of absence, Chris Gardner remarked that "he wished he too could take weeks off in reference to [Ms. Marshall]

being on leave, to which her direct supervisor . . . [Ms.] Sarley snickered and replied, 'yeah, me too.'" *Id.*

According to Rawlings, in May 2012, all of the Team Leads and analysts at Rawlings were told to reduce their individual backlogs to zero by July 15, 2012. (Docket No. 34-1 at 7.) Rawlings states that during this time, Ms. Marshall was not receiving new files in an attempt to help her catch up on her backlog. *Id.* Ms. Marshall contends that this project imposed "unreasonable demands and requirements on her . . . [in] an obvious attempt to force her resignation/termination." Ms. Marshall alleges that Mr. Elsner the Division Director for the Workers' Comp Division asked her to "send a meeting request to all the team leads . . . for leadership skills." (Docket No. 37 at 8.) She says that at the meeting, Mr. Elsner dismissed everyone else and stated that the meeting was only for Ms. Marshall. *Id.* Ms. Marshall recounts that she expressed to Mr. Elsner during this meeting that "she was having a difficult time with her work load considering all of the work that had built up when she was out." *Id.* According to Marshall, Mr. Elsner acknowledged her difficulties by shaking his head but offered no help or advice. *Id.* She claims that she asked Mr. Elsner for help with her backlog shortly after this meeting, and he offered no help just his sympathy. *Id.*

Ms. Marshall recounts a particular interaction with Ms. Sarley who as Team Operations Manager oversaw all of the Team Leads. Ms. Marshall alleges that she met with Ms. Sarley to discuss her backlog and that Ms. Sarley brought a spreadsheet with daily goals that would ensure Ms. Marshall completed her backlog by the July deadline. *Id.* Ms. Marshall states that Ms. Sarley told her anyone who had a backlog of files remaining by the July deadline would be terminated. *Id.* Ms. Marshall states that she returned to Ms. Sarley the next day and expressed that she felt the daily goals were "unrealistic" and that she was "uncomfortable" with Ms. Sarley's comment

regarding the termination of employees who failed to meet the deadline. *Id.* She contends that Mr. Elsner joined the conversation and that she told both of them that "she felt like she was being managed out of her position." *Id.* (internal quotation marks omitted). She also recounts that she told them "she felt like she was being forced to do more than the average person just because she was on leave." *Id.* (internal quotation marks omitted). Ms. Marshall did not understand why Rawlings did not provide her assistance with her backlog as Ms. Sarley's backlog had allegedly been transferred to analysts on other teams including Ms. Marshall's team. *Id.* at 9. Despite her concerns about being unable to meet the deadline, Ms. Marshall successfully cleared her backlog by the July deadline. (Docket Nos. 34-1 at 7; 37 at 9.)

Ms. Marshall's difficulties did not end though after meeting the July deadline as she was also behind in closing her team members' no recovery files. (Docket Nos. 34-1 at 7; 37 at 9.) Ms. Marshall met with Jeff Bradshaw, the Vice President of Subrogation and Workers' Compensation Operations at Rawlings to discuss the backlog of no recovery files. (Docket Nos. 34-1 at 9; 37 at 9.) Ms. Marshall contends that Bradshaw began the meeting by sarcastically asking her "So, are you planning on being out any time soon again?" (Docket No. 37 at 9.) At the meeting which occurred five months after Ms. Marshall's FMLA leave, Mr. Bradshaw gave her two weeks to close her team members' no recovery files. (Docket Nos. 34-1 at 7; 37 at 9.) Notably, Ms. Marshall was not the only team lead put on a plan to reduce backlogged no recovery files. (Docket No. 34-1 at 7; 34-5 at 23.) Ms. Marshall communicated with Mr. Bradshaw about her progress on the files and occasionally expressed difficulty with the task. (Docket Nos. 34-1 at 7; 34-14; 37 at 10.) As she was having trouble with closing all of her team's no recovery files, she asked Mr. Bradshaw if two of her team members could help her with them. (Docket Nos. 34-14 at 3-4; 37 at 10.) Mr. Bradshaw responded that he "would prefer

[Ms. Marshall] own the task of completing these reviews and utilize [her two team members] to answer file handling questions from [her] team so [she could] get [her no recovery files] accomplished." (Docket No. 34-14 at 3.) Ms. Marshall completed the task of catching up on her no recovery files with a slight extension from Mr. Bradshaw. (Docket No. 34-14 at 1-3.) In her email alerting Mr. Bradshaw to her completion of the task, Ms. Marshall stated that she realized that "it [was] imperative to spend one-on-one time with [her] new reps," and she told him that beginning the next week she would "incorporate[e] 30 minute sessions" with the new analysts on her team. (Docket No. 34-14 at 2.) In his response, Mr. Bradshaw told Ms. Marshall that he was glad that she was getting "back on track but the work had just begun." *Id.* at 1. He gave Ms. Marshall a list of priorities which included spending time with new analyst every day. *Id.*

Shortly after Ms. Marshall caught up on the backlog of her no recovery files, she was demoted back to the position of analyst. (Docket Nos. 34-1 at 8; 37 at 11.) According to Mr. Elsner, Mr. Bradshaw came to him with concerns about Ms. Marshall's ability to successfully serve as a Team Lead. (Docket Nos. 34-1 at 8; 34-3 at 14.) According to Rawlings, Mr. Bradshaw was concerned because Ms. Marshall was beginning to fall behind again on her own files and her team's no recovery files, working extremely long hours, and required assistance from other team leads. (Docket Nos. 34-1 at 8; 34-3 at 13-14; 34-5 at 25-26.) In late September, Laura Plumley, who served as the President of the Workers' Compensation Division, made the decision to demote Ms. Marshall upon Mr. Bradshaw's recommendation. (Docket Nos. 34-1 at 8; 34-3 at 14.) In a sworn affidavit, Ms. Plumley stated that she demoted Ms. Marshall "because she was struggling to successfully perform her duties as an analyst and a team lead." (Docket No. 34-2 at 2.) She also stated that "[a]t at the time [she] made the decision to demote [Ms. Marshall], [she] was not familiar with [Ms. Marshall's] family and medical leave or mental health

conditions." *Id.* Mr. Bradshaw and Mr. Elsner met with Ms. Marshall on September 24, 2012 to inform her of Ms. Plumley's decision and to discuss her performance. (Docket Nos. 34-1 at 8; 37 at 11-12.) According to Rawlings, "[Mr.] Bradshaw told [Ms. Marshall] that the team lead role was not the best fit for [her] to be successful at Rawlings, and that [she] was not as effective and efficient as she needed to be as a team lead." (Docket No. 34-1 at 8.) Ms. Marshall's account of the meeting is different. She states that he initially told her that she was being demoted to analyst so that she "could get back on [her] feet" and that management had "decided to reorganize the Workers' Compensation division." (Docket No. 34-5 at 26.) At the same time that Ms. Marshall was demoted, Rawlings eliminated the position of Team Operations Manager and, consequently, Ms. Sarley was demoted to a team lead and took over Ms. Marshall's team. (Docket No. 34-1 at 8.)[1] Ms. Marshall alleges that she then asked Mr. Bradshaw for "a copy of the report from which he made his decision to demote her." (Docket No. 37 at 12.) She claims that Mr. Bradshaw then became aggressive and stated that "if [he] wanted to, [he] could go print out a report" at that moment. (Docket Nos. 34-5 at 26; 37 at 12.) According to Ms. Marshall, Mr. Bradshaw said that she did not know what she was doing and was completely inefficient and that despite working long hours, she could not get her work done. (Docket Nos. 34-5 at 26; 37 at 12.) Ms. Marshall remembers that the meeting ended with her in tears. (Docket No. 37 at 12.) Following her demotion, Ms. Marshall recounts that her workspace was moved away from the other analysts and next to Mr. Elsner and across from Mr. Bradshaw. *Id.* Rawlings explains that Ms. Marshall switched seats with the newly demoted Ms. Sarley. (Docket No. 40 at 17.) Mr. Bradshaw contends that he told Ms. Marshall that her relocation would "keep her prior team members from continuing to ask her questions and allow her to get caught up on her files." *Id.*

---

[1] According to Mr. Elsner's affidavit, Ms. Sarley had not taken any family and medical leave in the prior year and was not disabled in any way. (Docket No. 34-8 at 2.)

In February 2013, Ms. Marshall contends that she began having health problems again. (Docket No. 37 at 13.) On February 18, 2013, Ms. Marshall went to the emergency room after she left work because she was experiencing chest pains. *Id.* She states that she emailed her new team lead Matt Monyhan and copied Mr. Elsner on the email to inform them of what had occurred and let them know that she was going to the doctor that morning. *Id.* On March 18, 2013, Ms. Marshall took her second FMLA leave for her depression, and she did not return to work until March 29, 2013. *Id.* Furthermore, between April 2013 and August 2013, Ms. Marshall took intermittent FMLA leave due to her anxiety, depression, and other mental health issues. *Id.* According to Rawlings, Ms. Marshall's "financial and production goals were adjusted downward to take into consideration her leave." (Docket No. 34-1 at 9.) Additionally, Rawlings points out that in the months in which Ms. Marshall took intermittent FMLA leave, she remained an analyst and received "the same rate of pay with the same benefits." *Id.*

Even though she had to take FMLA leave, Ms. Marshall continued to meet most of her financial recovery goals and "was one of the top five analysts in Workers' Compensation in terms of recoveries for the first quarter." (Docket No. 37 at 14; *see also* Docket No. 34-1 at 9.) Ms. Marshall was invited to a lunch for being one of the analysts with the highest recoveries. (Docket No. 37 at 14.) At the conclusion of the lunch according to Ms. Marshall and another analyst, Mr. Bradshaw asked about the morale of the office. (Docket Nos. 37 at 14; 37-14 at 2.) According to Ms. Marshall and her colleague, Mr. Bradshaw specifically reached out to Ms. Marshall and asked for her opinion. (Docket Nos. 37 at 14; 37-14 at 2.) Ms. Marshall allegedly replied that some of the analysts in the office "were doing very well and some of them were just getting by." (Docket No. 37 at 15.) According to the sworn affidavit of Ms. Marshall's colleague,

Mr. Bradshaw was aggressive and the other analysts at the lunch remained silent "because it was so uncomfortable at the table." (Docket No. 37-14 at 2.)

While Ms. Marshall was meeting most of her financial recovery goals, she did not meet several other goals set for analysts, "including the number of outbound calls required per day and the number of checks recovered each month." (Docket Nos. 34-1 at 9; 37 at 15.) Rawlings also contends that she did not meet her daily goals for the minimum number of files an analyst was expected to touch in a day. (Docket Nos. 34-1 at 9; 34-8 at 3; 34-18 at 1.) As a result of this issue, Mr. Elsner and team lead Matt Monyhan considered putting Ms. Marshall on a Performance Improvement Plan ("PIP"). (Docket Nos. 34-1 at 9; 37 at 15.) They did not ultimately place Ms. Marshall on a PIP, but Mr. Monyhan did note her alleged difficulties including her low file inventory and excessive backlog in her 2013 mid-year evaluation. (Docket Nos. 34-1 at 9; 34-18 at 1.) Mr. Elsner stated that the reason he and Mr. Monyhan ultimately did not recommend putting Ms. Marshall on a PIP was that they were not sure whether or not to do so would have violated the FMLA. (Docket No. 37-2 at 32-33.)

In July 2013, Mr. Monyhan informed Mr. Elsner and Mr. Bradshaw that he was concerned about his team lead bonus. (Docket No. 37-27 at 1.) He noted in his email to them that analysts who are absent due to FMLA leave are "given pro-rated performance goals based upon the time that they were actually in attendance." *Id.* He wanted his bonus to be based upon Ms. Marshall's pro-rated goal of $183,629 as opposed to her non-pro-rated goal of $202,625. *Id.* he reasoned that if Rawlings were to use the pro-rated goal he would have received a bonus as Ms. Marshall exceeded the pro-rated goal by $15,000. *Id.* He argued the following:

> Since a large portion of my income is dependent upon my analysts hitting their quarterly goal, the extended absence of a team member for FMLA has a negative effect on my paycheck. In [Ms. Marshall's] case, there were many instances when I would spend hours in a given day

working on files and phone calls that could not wait for her return. So, there is extra work with less reward. However, if consideration is given to the goals of the analyst, then it only stands to reason that the goals of the Team Lead should be adjusted as well.

*Id.* Ultimately, Mr. Monyhan's request was denied and his goal was not adjusted. (Docket No. 37 at 18.) He did not get a team lead bonus for the quarter. *Id.*

On September 23, 2013, Mr. Elsner and Mr. Monyhan allegedly noticed that Ms. Marshall and a co-worker were not at their desks throughout most of the work day. (Docket No. 34-1 at 10.) Mr. Elsner stated that this "upset" him as he and Mr. Monyhan "had been trying to get [Ms. Marshall] to focus on catching up on her file backlog." (Docket No. 34-8 at 2.) Mr. Monyhan and Mr. Elsner decided to call an impromptu meeting to confront Ms. Marshall and her co-worker about their work ethic that day. (Docket Nos. 34-1 at 10; 37 at 19.) According to Ms. Marshall, she told them that she had been working that day. (Docket No. 37 at 19.) Mr. Monyhan expressed his disagreement with her statement, and stated that he had pulled Ms. Marshall's phone reports and she had been logged off for quite a while throughout the day. (Docket Nos. 37 at 19; 37-2 at 36.) Mr. Elsner then asked Ms. Marshall about morale and stated that she appeared not to be passionate about her job. (Docket Nos. 34-1 at 10; 37 at 19; 37-2 at 36.) Ms. Marshall responded that after her return from FMLA leave, she had been verbally harassed by Mr. Bradshaw. (Docket Nos. 34-1 at 10; 37 at 30.) Additionally, Ms. Marshall alleges that she told Mr. Elsner that after taking FMLA leave, "she felt she was discounted, sidelined, and treated differently but that she had never said anything because she was afraid of losing her job."[2] (Docket No. 37 at 20.) Mr. Elsner then dismissed Mr. Monyhan and the co-worker to further discuss Ms. Marshall's concerns. (Docket Nos. 37 at 20; 37-2 at 38.) Ms. Marshall stated that she

---

[2] According to Mr. Elsner, Ms. Marshall did not mention FMLA leave during this meeting. (Docket No. 37-2 at 38.) In his deposition, Elsner stated "I don't remember her saying the words FMLA . . . [s]he may have said missing work." *Id.*

felt harassed by Mr. Bradshaw at the meeting regarding her demotion and at the lunch for top earning analysts. (Docket Nos. 37 at 20; 37-2 at 37.) According to Ms. Marshall, Mr. Elsner asked her if she wanted him to make a complaint with HR or have a meeting with Mr. Bradshaw about her allegations. (Docket No. 37 at 20.) She states that she told him that she did not want to do either option because she feared for her job, and Mr. Elsner agreed to let her think about it. *Id.* When Mr. Elsner went back to her a few days later, Ms. Marshall still had not decided to report her allegations of harassment. *Id.* The next day Mr. Elsner reported Ms. Marshall's harassment claim per Rawlings policy to Joan O'Brien the Vice President of Human Resources. (Docket No. 37-2 at 40.) According to Rawlings, Ms. O'Brien took notes during her meeting with Mr. Elsner and suggested that Mr. Elsner and Ms. Plumley meet with Ms. Marshall to discuss her claims as Ms. O'Brien was scheduled to be out of the office. (Docket No. 34-1 at 12.) Subsequently, Ms. Marshall received a calendar request via email to meet with Ms. Plumley and Mr. Elsner the following Monday. (Docket No. 37 at 21.)

On Monday, September 30, 2013, Ms. Marshall met with Ms. Plumley and Mr. Elsner. (Docket Nos. 34-1 at 12; 37 at 21.) According to Ms. Marshall, she took notes to the meeting and gave a copy to Ms. Plumley. (Docket No. 37 at 21.) Mr. Elsner took notes summarizing the issues discussed during the meeting. (Docket No. 37-31.) Ms. Marshall contends that she told Mr. Elsner and Ms. Plumley that "she felt sidelined, [and] iced out" and detailed Mr. Bradshaw's allegedly harassing behavior. (Docket No. 37 at 21-22.) Ms. Marshall also allegedly expressed concerns that people in the office had been discussing her FMLA leave. (Docket No. 37-2 at 42.) Ms. Plumley contends that when asked about Mr. Bradshaw's alleged harassment, Ms. Marshall stated that in both instances his demeanor was "aggressive" and "belittling." (Docket No. 34-2 at 3.) According to Ms. Plumley, Ms. Marshall did not suggest that Mr. Bradshaw mentioned her

11

FMLA leave in either instance. *Id.* at 4. After hearing Ms. Marshall's account of the events, Ms. Plumley concluded that her allegations "did not amount to a valid complaint or constitute protected activity." (Docket No. 34-1 at 14 (internal quotation marks omitted).)

Ms. Marshall contends that during the meeting Ms. Plumley promised her that she would not be fired. (Docket No. 37 at 22.) However, Ms. Plumley responds that she in fact said, "no one would be retaliated against if they made a valid complaint of harassment." (Docket No. 34-1 at 13.) Plumley denies that she assured Ms. Marshall of her job security. *Id.*

At the end of the meeting, Ms. Plumley questioned Ms. Marshall's motives for coming forward with her allegations several months after the alleged conduct. (Docket Nos. 37 at 22; 37-31 at 5.) According to Mr. Elsner, Ms. Marshall responded to Ms. Plumley's inquiry by saying that she came forward about the harassment because Mr. Elsner asked her in the previous meeting what was going on and she had hesitated to come forward because she feared for her job. (Docket Nos. 34-1 at 13; 37-2 at 42.) Rawlings still questions the legitimacy of Ms. Marshall's report as "she mentioned these interactions with Bradshaw—which occurred in September 2012 and May 2013—for the first time in late September 2013, and in response to being questioned by her supervisor about her lack of work and focus on a specific day." (Docket No. 34-1 at 11.)

After the meeting, Ms. Plumley met with George Rawlings, the owner of the company, to discuss Ms. Marshall's allegations against Mr. Bradshaw. (Docket No. 34-1 at 14.) In a sworn affidavit, Ms. Plumley states that she did not tell Mr. Rawlings about Ms. Marshall's comments that people in the office were talking about her FMLA leave or had treated her differently upon her return from leave. (Docket No. 34-2 at 5.) After speaking with Ms. Plumley, Mr. Rawlings called Mr. Elsner to ask about Ms. Marshall's claims of harassment. (Docket No. 34-1 at 14.)

12

According to Rawlings, "[Mr.] Elsner reported to Mr. Rawlings that he did not think Bradshaw's actions amounted to harassment, as [he] was present for and a witness at both the demotion meeting and the lunch." *Id.* Mr. Rawlings then resolved to speak with Ms. Marshall. *Id.*

On October 1, 2013, Ms. Marshall met with Mr. Rawlings and an employee from Human Resources. (Docket Nos. 34-1 at 14; 37 at 22.) Mr. Rawlings and Ms. Marshall discussed her allegations against Mr. Bradshaw. (Docket Nos. 34-1 at 14; 37 at 22.) According to Mr. Rawlings, Ms. Marshall never made any statement during their meeting concerning her mental health issues or her FMLA leave. (Docket Nos. 34-1 at 15; 34-20 at 4.) Additionally, the Human Resource Representative's notes do not reflect that Ms. Marshall ever mentioned her medical issues or FMLA leave during the meeting. (Docket Nos. 34-1 at 15; 34-21 at 1-3) However, Ms. Marshall contends that in recounting her conversation with Mr. Elsner she mentioned to Mr. Rawlings that she felt she was treated differently when she returned from her FMLA leave. (Docket No. 34-17 at 3.) With regards to Mr. Rawlings prior knowledge of her FMLA leave, Ms. Marshall has acknowledged that she has no knowledge that he knew of her FMLA leave prior to her termination meeting. (Docket Nos. 34-1 at 15; 34-16 at 2.) Mr. Rawlings ultimately told Ms. Marshall that he did not believe Mr. Bradshaw's actions constituted harassment. (Docket Nos. 34-1 at 15; 37 at 22.) Mr. Rawlings concluded that Ms. Marshall "was making false allegations of harassment in order to avoid the consequences of her own excessive absences from her desk" on the day in question. (Docket Nos. 34-1 at 16; 34-20 at 3.) Mr. Rawlings expressed his disappointment with Ms. Marshall, told her that she had an attitude problem, and terminated her employment with Rawlings at that time. (Docket Nos. 34-1 at 16; 34-20 at 4; 37 at 22.)

Following Ms. Marshall's termination, she filed this action seeking relief under the Family Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), and

Kentucky common law for Intentional Infliction of Emotional Distress ("IIED"). Rawlings has now filed a Motion for Summary Judgment on all of Ms. Marshall's claims against it. (Docket No. 34.) This Court will address the substance of each of Ms. Marshall's claims below.

## Legal Standard

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the party moving for summary judgment, Rawlings must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Ms. Marshall's claims. Fed. R. Civ. P. 56(c); *see Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming Rawlings satisfies its burden of production, Ms. Marshall "must—by deposition, answers to interrogatories, affidavits, and admissions on file— show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). Keeping this standard in mind, the Court moves on to the merits.

14

**Discussion**

I.      Ms. Marshall's Claim under the FMLA for Interference/Discrimination and
Retaliation

The FMLA "entitles an eligible employee to as many as twelve weeks of leave during any twelve-month period if the employee has a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Arban v. W. Pub. Corp.*, 345 F.3d 390, 400 (6th Cir. 2003) (quoting 29 U.S.C. § 2612(a)(1)(D)) (internal quotation marks omitted). "Serious health condition" means "an illness, injury, impairment or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider." 29 C.F.R. § 825.102. When an employee wishes to take FMLA leave, "[a]ll the employee must do is notify the employer that FMLA-qualifying leave is needed." *Arban*, 345 F.3d at 400 (citing 29 C.F.R. § 825.303(b)). After an employee returns from FMLA leave, he "must be reinstated to his position or an equivalent position in terms of pay, benefits, and other conditions of employment." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 281 (6th Cir. 2012) (citing 29 U.S.C. § 2614(a)(1)).

The FMLA prohibits employers "from interfering with, restraining, or denying the exercise of their employees' rights under the statute, and also makes it unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (citing 29 U.S.C. § 2615(a)(1), (a)(2), (b)). If an employer violates the FMLA, the employer is "liable to the employee for damages and such equitable relief as may be appropriate." *Seeger*, 681 F.3d at 281 (citing 29 U.S.C. § 2617(a)(1)).

The Sixth Circuit Court of Appeals has recognized two distinct theories of wrongdoing under the FMLA. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citing *Killian v. Yorozu*

15

*Auto. Tenn., Inc.*, 454 F.3d 549, 555–56 (6th Cir. 2006)). The first theory known as the "entitlement" or "interference" theory "arises from §§ 2615(a)(1) and 2614(a)(1), which make it unlawful for employers to interfere with or deny an employee's exercise of [his] FMLA rights, § 2615(a)(1), and which require the employer to restore the employee to the same or an equivalent position upon the employee's return, § 2614(a)(1)." *Id.* (citing *Arban*, 345 F.3d at 400–01). This theory "is derived from the FMLA's creation of substantive rights." *Id.* The second theory referred to as the "retaliation" or "discrimination" theory, "arises from § 2615(a)(2), which prohibits an employer from discharging or discriminating against an employee for opposing any practice made unlawful by" the Act. *Id.* (citing *Arban*, 345 F.3d at 400–01). The Court will address both theories below.

A.  Interference Theory

In order to prevail under the interference theory, an employee must establish the following five elements:

> (1) [s]he was an eligible employee, (2) defendant was a covered employer, (3) [s]he was entitled to leave under the FMLA, (4) [s]he gave defendant notice of [her] intent to take leave, and (5) the defendant denied [her] FMLA benefits or interfered with FMLA rights to which [s]he was entitled.

*Harris v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 594 F.3d 476, 482 (6th Cir. 2010) (citing *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). An employer commits a violation under this theory if the employer, "interferes with the FMLA-created right to medical leave or to reinstatement following the leave, . . . regardless of the intent of the employer." *Seeger*, 681 F.3d at 282 (quoting *Arban*, 345 F.3d at 401) (internal quotation marks omitted). Notably, the Sixth Circuit has established that the *McDonnell Douglas* burden-shifting framework applies to interference claims under the FMLA, however, as Ms. Marshall does not

16

establish a *prima facie* claim under the interference theory, the Court need not engage in such an analysis at this time. *Donald v. Sybra, Inc.,* 667 F.3d 757, 762 (6th Cir. 2012).

Here, only the fifth element is at issue as the parties do not agree as to whether or not Rawlings interfered with Ms. Marshall's FMLA rights. (Docket No. 34-1 at 17-19.) The Sixth Circuit has stated that "[t]he issue [under the interference theory] is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve week leave or reinstatement after taking a medical leave." *Seeger*, 681 F.3d at 283 (quoting *Arban*, 345 F.3d at 401). Therefore, "[a]s a rule of thumb, where a plaintiff does not dispute that she has been granted all of the FMLA leave that she requested, has received all of the leave to which she was entitled, and has been reinstated upon her return to work, 'the essence' of the plaintiff's claim is likely a retaliation claim, not an interference claim, regardless of the conclusory labels under which it has been pled." *Wallner v. Hilliard*, 590 F. App'x 546, 551 (6th Cir. 2014) (citing *Seeger*, 681 F.3d at 282). In *Seeger*, the Sixth Circuit found that as the employee's request for leave was approved, he received all of the FMLA leave to which he was entitled under the statue, and he was reinstated by his employer to his former position upon return, he did not have a claim for interference. *Seeger*, 681 F.3d at 283. The court found that there was no claim for interference when the employer "did not shortchange [the employee's] leave time, deny reinstatement, or otherwise interfere with his substantive FMLA rights." *Id.*

Here, Ms. Marshall does not dispute that Rawlings granted all of the FMLA leave she requested nor does she dispute that she received all of the FMLA leave to which she was entitled. (Docket Nos. 34-1 at 18-19; 34-5 at 12-13; 34-10; 37 at 24; 37-22.) Furthermore, after her first FMLA leave and her subsequent intermittent FMLA leave, she does not claim that Rawlings failed to reinstate her to her former position. (Docket Nos. 34-1 at 18-19; 37 at 7-14.) Therefore,

in accordance with Sixth Circuit precedent, this Court finds that Ms. Marshall has not stated a claim under the interference theory.

### B.  Retaliation Theory

Ms. Marshall also argues that Rawlings retaliated against her for taking FMLA leave. (Docket No. 1 at 3-4.) Under the FMLA, employers are prohibited from discriminating against employees who have taken leave and from using an employee's taking of leave as a negative factor in employment actions. *Arban*, 345 F.3d at 403. "This prohibition includes retaliatory discharge from taking leave." *Id.* (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001)). This prohibition also includes demoting an employee for taking leave. *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 391 (6th Cir. 2005). When a plaintiff seeks to prove retaliation under the FMLA through circumstantial evidence, the court must apply the *McDonnell Douglas* burden-shifting test. *Edgar*, 443 F.3d at 508 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a *prima facie* case of FMLA retaliation, Ms. Marshall must demonstrate the following:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald*, 667 F.3d at 761 (quoting *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)).  The burden of proof at the *prima facie* stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger*, 681 F.3d 283 (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). Unlike the interference theory, under the

18

retaliation theory, an employer's "motive is an integral part of the analysis . . . because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Edgar*, 443 F.3d at 508 (citations omitted). "After an employee establishes a *prima facie* case of FMLA retaliation, the burden shifts to the defendant to establish a legitimate, non-discriminatory reason for its action." *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 842 (6th Cir. 2012). If the employer indeed articulates a legitimate, non-discriminatory reason, the burden then shifts back to the employee to show that "the articulated reason is in reality a pretext to mask discrimination." *Skrjanc*, 272 F.3d at 315 (citation omitted).

This Court must first determine whether or not Ms. Marshall successfully establishes a *prima facie* case of retaliation under the FMLA. Under the first element of a retaliation claim, the employee must have engaged in a protected activity. *Donald*, 667 F.3d at 761. With regards to whether or not Ms. Marshall was engaged in a protected activity, the Sixth Circuit has established that by taking FMLA leave an employee engages in a protected activity. *See Bryant v. Dollar Gen. Corp.*, 538 F.3d 394, 402 (6th Cir. 2008). According to the Sixth Circuit, "the FMLA . . . prohibit[s] employers from considering an employee's use of FMLA leave as a negative factor in employment decisions." *Id.* As Ms. Marshall took FMLA leave on multiple occasions, this element of a *prima facie* claim for retaliation is satisfied.[3]

---

[3] The Court disagrees with Rawlings characterization of Ms. Marshall's protected activity. Rawlings states that it "does not address [Ms. Marshall's] use of leave as a protected activity to support her . . . retaliations claim, as she received all leave to which she requested and was entitled and [Ms. Marshall] does not claim she [was] demoted or discharged in retaliation for requesting leave." (Docket No. 34-1 at 20 n.7.) Rawlings goes on to argue that "[i]nstead, the underlying retaliation claim relates to whether [Ms. Marshall's] alleged statements to supervisors after taking leave played a role in any adverse employment decisions." *Id.* However, in her Amended Complaint, Ms. Marshall claims that "Rawlings interfered with [her] exercise of her rights provided by the FMLA, [and] discriminated against [her] for taking medical leave under the FMLA." (Docket No. 19 at 5.) Ms. Marshall's retaliation claim is rooted in her act of taking FMLA leave, which allegedly led to the negative treatment by her superiors and ultimately the adverse employment actions of her demotion and discharge. (Docket No. 37 at 24-30.) Consequently, she has satisfied the first prong of a *prima facie* case.

The second element of a *prima facie* claim for retaliation under the FMLA requires that the employer know that the employee has exercised her rights under the FMLA. *Donald*, 667 F.3d at 761. Here, Ms. Plumley made the decision to demote Ms. Marshall, the first adverse employment action, and Mr. Rawlings made the decision to terminate Ms. Marshall, the second adverse employment action. (Docket No. 34-1 at 22-25.) Rawlings argues that neither Ms. Plumley nor Mr. Rawlings knew about Ms. Marshall's FMLA leave and, therefore, she cannot establish the knowledge prong of a *prima facie* case. *Id.* Both Ms. Plumley and Mr. Rawlings have signed affidavits stating that they had no knowledge of Ms. Marshall's FMLA leave before making their decisions to respectively demote and terminate her. (Docket Nos. 34-2 at 2; 34-20 at 4.)  Furthermore, Ms. Plumley states that she based her decision solely on Ms. Marshall's job performance, and Mr. Rawlings states that he based his decision on what he believed to be were false allegations by Ms. Marshall against Mr. Bradshaw for harassment.  (Docket Nos. 34-2 at 2; 34-20 at 3.) This would appear to defeat the second element, but Ms. Marshall asserts that the knowledge requirement can be satisfied under the cat's paw theory of liability. (Docket No. 37 at 28-30.)  The Court must therefore address this argument.

The Sixth Circuit of Appeals recently stated in an unpublished opinion that it has "not applied the 'cat's paw' theory to an FMLA case." *Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 496 (6th Cir. 2015). The Sixth Circuit generally applies the cat's paw theory to Title VII discrimination claims and claims brought under the Uniform Service Employment and Reemployment Rights Act ("USERRA"). *Id.* The court explained in its opinion that when considering retaliation claims, "the availability of cat's paw theory to impute knowledge of a protected activity to the decisionmaker is less than clear under this court's precedent . . . ." *Id.* (quoting *Vander Boegh v. EnergySolutions, Inc.*, 536 Fed. Appx. 522, 532 (6th Cir. 2013)).

Ultimately, the court did not address whether or not to extend the cat's paw theory of liability to FMLA retaliation cases. *Id.* However, this Court finds it persuasive that its sister court has applied the cat's paw theory relatively recently to a FMLA claim. *See Curry v. Goodwill Indus. of Kentucky, Inc.*, No. 1:11CV-00093-JHM, 2013 WL 1411132, at *7 (W.D. Ky. Apr. 8, 2013).

"In the employment discrimination context, what is known as the 'cat's paw' theory refers to a situation in which a biased subordinate, who lacks decisionmaking power, influences the unbiased decisionmaker to make an adverse hiring decision, thereby hiding the subordinate's discriminatory intent." *Cobbins v. Tennessee Dep't of Transp.*, 566 F.3d 582, 587 n.5 (6th Cir. 2009) (citations omitted). The Sixth Circuit has "recognized that a plaintiff can show discrimination by offering evidence of a causal nexus between the ultimate decisionmaker's decision to [take the adverse employment action] . . . and the [biased subordinate's] discriminatory animus." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350 (6th Cir. 2012) (quoting *Madden v. Chattanooga City Wide Serv. Department*, 549 F.3d 666, 677 (6th Cir. 2008)). Essentially, the "Plaintiff must show that [b]y relying on this discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the biased subordinate's] prejudice— his cat's paw." *Id.* (quoting *Madden*, 549 F.3d at 678) (internal quotation marks omitted). In *Staub v. Proctor*, the United States Supreme Court elaborated on the cat's paw theory of liability. *See* 562 U.S. 411 (2011). The Supreme Court found that cat's paw liability attaches "if a [biased subordinate] performs an act motivated by . . . animus that is *intended* by the [subordinate] to cause an adverse employment action, and . . . if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Chattman*, 686 F.3d at 351 (emphasis in original). With regards to the biased subordinate's intent, the Court stated that "[a]nimus and responsibility for the adverse action can both be attributed to the [biased subordinate] . . . if the

adverse action is the intended consequence of that [subordinate's] discriminatory conduct. So long as the [subordinate] intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable . . . ." *Staub*, 562 U.S. at 419.

In order for cat's paw liability to attach, the non-decision making subordinate employee must have been motivated by retaliatory animus. Here, Mr. Bradshaw and Mr. Elsner knew of Ms. Marshall's FMLA leave. (Docket No. 37 at 28.) Ms. Marshall argues that Mr. Bradshaw and Mr. Elsner acted with animus and recommended her demotion to Ms. Plumley as well as brought Ms. Marshall's "complaint" about harassment to Ms. Plumley, which ultimately led to Mr. Rawlings' decision to terminate her. *Id.* Ms. Marshall argues that Ms. Plumley "was [Mr.] Bradshaw and [Mr.] Elsner's cat's paw both as to [her] demotion and her termination." *Id.* at 29. Despite Ms. Marshall's allegations, she provides no evidence of retaliatory animus on the part of either Mr. Bradshaw or Mr. Elsner. Ms. Marshall's only evidence of potential animus is one stray, isolated comment by Mr. Bradshaw. During a meeting regarding Ms. Marshall's no recovery files backlog, Mr. Bradshaw allegedly asked her if she was "planning on being out any time soon again." *Id.* at 9, 32. Other than this stray comment, Ms. Marshall highlights her demotion meeting and the lunch honoring successful analysts as she feels Mr. Bradshaw was hostile towards her on those occasions. *Id.* at 11-15. However, Ms. Marshall has not pointed to any evidence that ties his allegedly hostile behavior in any way to her FMLA leave. Viewing the evidence in a light most favorable to Ms. Marshall, her vague and general allegations are simply not sufficient to demonstrate that Mr. Bradshaw harbored any retaliatory animus. *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 73 (1st Cir. 2015). As there is insufficient evidence that Mr. Bradshaw was in fact a biased subordinate who harbored retaliatory animus, the cat's paw theory of liability is inapplicable in this case. Consequently, Ms. Marshall cannot

satisfy the second element of a prima facie case for retaliation, which requires that the employer know that she was exercising her rights under the FMLA. The Court will not address the remaining elements of a *prima facie* claim as Ms. Marshall's claim for retaliation under the FMLA fails due to her inability to satisfy the second element.

Even if Ms. Marshall had successfully established a *prima facie* case, her claim for retaliation would still fail, as Ms. Marshall did not demonstrate that Rawlings' legitimate, non-retaliatory reasons for its adverse employment actions were pretextual under the third step of the *McDonnell Douglas* framework. The Court will proceed to the second and third steps of the *McDonnell Douglas* framework to illustrate the deficiencies in Ms. Marshall's attempt to show Rawlings' reasons were pretextual.

In the second step of the *McDonnell Douglas* framework, the burden shifts to Rawlings to show a legitimate, non-retaliatory reason for its action. Rawlings has provided legitimate, non-retaliatory reasons for both its demotion and termination of Ms. Marshall. With regards to the demotion, Ms. Plumley states that she decided to demote Ms. Marshall from Team Lead to an Analyst because "she was struggling to successfully perform her duties as an Analyst and a Team Lead." (Docket No. 34-2 at 2.) Concerning her termination, Mr. Rawlings states that he fired Ms. Marshall "for making false allegations of harassment in order to avoid the consequences of her own excessive absences from her desk." (Docket No. 34-20 at 4.) Rawlings contends that Ms. Marshall's "performance and false allegations of harassment violated the Company's policies requiring that employees perform to company standards and make harassment allegations in good faith." (Docket No. 34-1 at 27.) Rawlings reasons for terminating Ms. Marshall "constitute legitimate non[retaliatory] reasons . . . because they are reasons, supported by admissible evidence, which if believed by the trier of fact, would support a finding

that unlawful [retaliation] was not the cause of the employment action." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)) (internal quotation marks omitted).

In the final step of the *McDonnell Douglas* burden-shifting framework, the burden shifts back to Ms. Marshall to show that Rawlings' stated reasons for the adverse employment actions are "pretextual." *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 838 (6th Cir. 2012) (citing *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). According to the Sixth Circuit, "a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)). For Ms. Marshall to carry her burden in opposing Rawlings' Motion for Summary Judgment, she "must produce sufficient evidence from which a jury could reasonably reject [Rawlings'] explanation of why it [demoted and] fired her." *Id.* (citing *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008)). "The Sixth Circuit has cautioned that "[t]emporal proximity cannot be the sole basis for finding pretext." *Seeger*, 681 F.3d at 285 (citation omitted). However, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Id.* (quoting *Bell v. Prefix, Inc.*, 321 Fed. Appx. 423, 431 (6th Cir. 2009)).

The Court has extensively reviewed Ms. Marshall's argument regarding pretext and remains unclear as to which of the three prongs she is attempting to show pretext under. Consequently, the Court will address all three prongs of the pretext analysis.

The first method for showing pretext requires that Marshall demonstrate that Rawlings has no basis in fact for its decision. This is "essentially an attack on the credibility of the employer's proffered reason . . . [and] consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason." *Seeger*, 681 F.3d at 285 (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 Fed. Appx. 783, 791 (6th Cir. 2006)). When an employer, however, can demonstrate an honest belief in its reason, the inference of pretext is not warranted. *Id.* (quoting *Joostberns*, 166 Fed. Appx. at 791). The Sixth Circuit has adopted the "honest belief rule." *Id.* "Under [this] rule, an employer's proffered reason is considered honestly held where the employer can establish it reasonably reli[ed] on particularized facts that were before it at the time the decision was made." *Seeger*, 681 F.3d at 285 (citing *Joostberns*, 166 Fed. Appx. at 791). The employee must then show that "the employer's belief was not honestly held." *Id.* (quoting *Joostberns*, 166 Fed. Appx. at 791). Notably, "an employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact." *Id.* (quoting *Joostberns*, 166 Fed. Appx. at 791). An employee must demonstrate "more than a dispute over the facts upon which the discharge was based." *Id.* (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001)). The employer's decision-making process need not "be optimal," as "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (quoting Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir.1998). "As long as the employer held an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Id.*

(quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)) (internal quotation marks omitted).

Here, Rawlings invokes the honest belief rule. (Docket No. 34-1 at 28.) With regards to Ms. Marshall's demotion, Rawlings argues that "there is no evidence that the information upon which [Ms.] Plumley relied in deciding to demote [Ms. Marshall] was somehow ill considered." *Id.* Ms. Plumley has asserted that she made the demotion decision based upon evidence that Ms. Marshall was struggling to successfully perform her duties as both an analyst and a team lead. (Docket No. 34-2 at 2.) Rawlings contends that Ms. Plumley relied on particularized facts in making her decision to demote Ms. Marshall. (Docket No. 34-1 at 28.) Rawlings points to emails in the record which show that Ms. Marshall struggled to finish her backlog project and to keep the backlog from growing again once she was caught up. (Docket Nos. 34-1 at 29; 34-14 at 1-9; 34-15 at 1-2.) It is clear from the information provided by Rawlings that Ms. Plumley "made a reasonably informed and considered decision" before deciding to demote Ms. Marshall. Furthermore, Ms. Marshall has failed to show that Ms. Plumley's belief about her performance difficulties was not honestly held. Ms. Marshall boldly asserts that it is "unworthy of credence to argue that she wasn't demoted due to FMLA, but rather because she wasn't up to being a supervisor of a team." (Docket No. 37 at 31.) She notes that she worked long hours with no help to clear her backlog by the July 2012 deadline and that she was told to fear for her job if she did not complete her backlog project on time. *Id.* These facts, however, are insufficient to prove that Ms. Plumley's belief about her employment issues was not honestly held. Ms. Marshall has not produced sufficient evidence to show that Rawlings "failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence.'" *Smith*, 155 F.3d at 807-08.

26

Additionally, concerning Mr. Rawlings decision to terminate Ms. Marshall's employment, Ms. Marshall has provided no evidence to suggest that he did not make a "reasonably informed and considered decision." *Id.* Rawlings is adamant that Mr. Rawlings relied on the particularized facts available to him at the time when he decided to terminate Ms. Marshall. (Docket No. 34-1 at 29.) Following her account of the instances in which she believed Mr. Bradshaw had harassed her, Mr. Rawlings concluded that neither of those instances constituted harassment. (Docket No. 34-20 at 3.) Mr. Rawlings states that he made the decision to fire Ms. Marshall when he "reached the conclusion she was making false allegations of harassment in order to avoid the consequences of her own excessive absences from her desk the day before." *Id.* In response, Ms. Marshall states that Mr. Rawlings "dismissed [her] legitimate concern for harassment and discrimination with the back of his hand." (Docket No. 37 at 33.) She additionally contends that Mr. Rawlings "categorized her needs as a lie intended only to slander fair-haired boy Jeff Bradshaw [and] [h]is minor effort is unworthy of credence." *Id.* Despite Ms. Marshall's passionate and colorful description of Mr. Rawlings decision to terminate her employment, she has not provided any evidence to show that Mr. Rawling's "belief was not honestly held." *Seeger*, 681 F.3d at 285. Consequently, Ms. Marshall has not shown pretext under the first prong.

The second method for demonstrating pretext requires that Ms. Marshall show that Rawlings' proffered reasons did not actually motivate its actions. This method requires that Ms. Marshall "admit[] the factual basis underlying the employer's proffered explanation and further admit[] that such conduct could motivate dismissal." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (citing *Manzer v. Diamond Shamrock Chemicals. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Under this method, Ms. Marshall must "attack[] [Rawlings']

explanation by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (emphasis in original) (quoting *Manzer*, 29 F.3d at 1084) (internal quotation marks omitted). "In other words, [Ms. Marshall must] argue[] that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that [Rawlings'] explanation is a pretext, or coverup." *Id.* (quoting *Manzer*, 29 F.3d at 1084).

After reviewing Ms. Marshall's pretext argument, the Court questions whether or not Ms. Marshall challenged Rawlings' decisions under this prong due to the lack of clarity of her argument. Even if she did admit the factual basis underlying Rawlings' explanation for her demotion and admit that such conduct on her part could motivate dismissal (although it is not clear that she has done so), she has failed to "show[] circumstances which tend to prove an illegal motivation was *more* likely than that offered by" Rawlings. *Smith*, 220 F.3d at 759. Ms. Marshall points to her two allegedly hostile encounters with Mr. Bradshaw and suggests that his motivation for treating her poorly was that he did not approve of her FMLA leave. (Docket No. 37 at 32.) Her strongest evidence for discrimination is a stray comment that she alleges Mr. Bradshaw made when he asked her during their meeting about her no recovery files backlog, "So, are you planning on being out any time soon again?" *Id.* at 9, 32. She also points to her meeting with Mr. Elsner and Mr. Monyhan regarding her absence from her desk on a day during the last week of September. *Id.* at 32. Ms. Marshall contends that she "felt harassed" when she was questioned by Mr. Elsner and Mr. Monyhan as she believes that her behavior was in line with typical office culture. *Id.* She alleges that she told them "she was being signaled out for harassment due to her leaves and condition." *Id.* Lastly, she points to Mr. Rawlings statement that she had an "attitude problem" as proof that he was trying to mask his true motive. *Id.* at 33.

She argues that Mr. Rawlings "dismissed [her] legitimate concern for harassment and discrimination with the back of his hand." *Id.*

Ms. Marshall's feelings or opinions as to why Mr. Bradshaw allegedly treated her badly or as to the motivation behind Ms. Plumley's decision to demote her and Mr. Rawling's decision ultimately to terminate her employment are insufficient to demonstrate pretext. *Porterfield v. Symrise, Inc.*, No. 1:14-CV-2005, 2016 WL 828757, at *2 (N.D. Ohio Mar. 3, 2016) (citing *Gaskins v. Rock-Tenn Corp.*, 982 F. Supp. 2d 760, 778 (S.D. Ohio 2013)). Ms. Marshall must provide "*evidence* that an adverse [employment] action was taken in retaliation for specific protected conduct." *Id.* (emphasis added). Ms. Marshall's conjecture that she was demoted and terminated in retaliation for taking FMLA is simply not legally sufficient and does not demonstrate pretext. Furthermore, Mr. Bradshaw's alleged statement asking if Ms. Marshall was "planning on being out any time soon" is not sufficient proof of discrimination to defeat summary judgment. "A mere scintilla of evidence in support of [Ms. Marshall's] position [is] insufficient for her claim to survive summary judgment." *Donald*, 667 F.3d at 761. Taken in the light most favorable to Ms. Marshall, Mr. Bradshaw's alleged stray and isolated comment is not "enough evidence such that the jury could reasonably find for her." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). With regards to the second prong utilized to demonstrate pretext, Ms. Marshall is unable to satisfy its requirements.

Under the third method for proving pretext, Ms. Marshall must show that Rawlings' reasons were insufficient to motivate Rawlings' actions. To prove pretext under this prong, Ms. Marshall must provide "evidence that other employees, particularly employees [that did not take FMLA leave], were not fired [or demoted] even though they engaged in substantially identical conduct to that which [Rawlings] contends motivated its discharge of [Ms. Marshall]." *Manzer*,

29

29 F.3d at 1084. Ms. Marshall has provided no such evidence in this action. (*See* Docket No. 37.) While she does mention that she feels having to meet with Mr. Elsner and Mr. Monyhan about being away from her desk too much was unusual because "that's standard culture at Rawlings for salaried employees," this declaration without any substantiation of such a claim or comparison to other particular employees is insufficient to survive a motion for summary judgment. (Docket No. 37 at 32.) Ms. Marshall is unable to show pretext under the third prong as well.

II.     Ms. Marshall's Claim under the ADA for Disability Discrimination

Ms. Marshall also claims that Rawlings demoted and terminated her in violation of the Americans with Disabilities Act ("ADA"). (Docket No. 19 at 5.) The ADA commands that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "As with FMLA claims, plaintiffs may prove disability discrimination using the *McDonnell Douglas* burden-shifting framework." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014) (citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008)). The *McDonnell Douglas* burden-shifting framework applies in cases such as this one where the plaintiff seeks to prove discrimination by indirect evidence. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004).

In order to establish a *prima facie* case of disability discrimination, Ms. Marshall must establish the following: "1) she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) [Rawlings] knew or had reason to know of [Ms. Marshall's] disability; and 5) the position remained open while [Rawlings] sought other applicants or the disabled individual was replaced." *Whitfield v.*

*Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (citing *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)).  As noted earlier in this opinion, "[u]nder the *McDonnell Douglas* burden-shifting framework, once a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual." *Id.* (citation omitted).

As Ms. Marshall's discrimination claim under the ADA ultimately fails under the pretext prong of the *McDonnell Douglas* analysis and the burden of proof at the *prima facie* stage is minimal, this Court will assume for the sake of argument that Ms. Marshall has successfully stated a *prima facie* case for retaliation. With regards to the second step of the *McDonnell Douglas* framework, Rawlings again asserts that it demoted and terminated Ms. Marshall due to her performance issues and her allegedly false allegations of harassment. (Docket No. 34-1 at 35.) Consequently, Rawlings has met its burden by providing legitimate and nondiscriminatory reasons for Ms. Marshall's demotion and termination. The burden then shifts back to Ms. Marshall to show that Rawlings' reasons are pretextual. Ms. Marshall cites her previous arguments in regards to pretext.[4] (Docket No. 37 at 40.) As the Court has already addressed Ms. Marshall's arguments regarding pretext and has determined that Ms. Marshall failed to meet her burden in demonstrating that Rawlings' reasons are pretextual, her claim for discrimination under the ADA also fails.

---

[4] Notably, while not part of Ms. Marshall's discussion of pretext regarding her ADA claim, she does argue on the previous page that others also struggled with their goals and were not singled out for demotion. (Docket No. 37 at 39.) The court feels that this is relevant to the third prong under pretext. *Id.* However, Ms. Marshall provides no citation to any evidence in the record that would support her argument that Mr. Elsner knew of other employees who had similar performance difficulties and who were not demoted. *Id.* Her only citation to the record is of an email from Chris Gardner, another team lead, to his team regarding their backlog and his disappointment in their performance. (Docket No. 37-35 at 2.) This does not in fact support Ms. Marshall's argument as Mr. Gardner was critiquing his team's performance and was not as a team lead being evaluated for his performance.

III.   Ms. Marshall's Common Law Claim for Intentional Infliction of Emotional Distress

Kentucky recognizes the tort of Intentional Infliction of Emotional Distress ("IIED"). *See Craft v. Rice*, 671 S.W.2d 247 (Ky. 1984). For a plaintiff to recover under a claim of IIED, he or she must show that: "(1) the wrongdoer's conduct was intentional or reckless, (2) the wrongdoer's conduct was outrageous and intolerable, (3) there is a causal connection between the conduct and the emotional distress, and (4) the emotional distress suffered is severe." *Benningfield v. Pettit Envtl., Inc.*, 183 S.W.3d 567, 572 (Ky. Ct. App. 2005) (citing *Wilson v. Lowe's Home Center*, 75 S.W.3d 229, 238 (Ky. Ct. App. 2001)). The plaintiff must show "that the conduct in question has been so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Sacharnoski v. Capital Consol., Inc.*, 187 F. Supp. 2d 843, 845 (W.D. Ky. 2002) (quoting *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990)) (internal quotation marks omitted). Importantly, the Kentucky Supreme Court has recognized that a wrongdoer's conduct may be considered extreme and outrageous if he or she knew that the other person was "peculiarly susceptible to emotional distress, by reason of some . . . mental condition or peculiarity." *Seitz*, 796 S.W.2d at 4 (quoting Restatement (Second) of Torts § 46 cmt. f (1965)). However, the court went on to caution that "major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough." *Id.* Kentucky has set a high threshold for those seeking to recover under a claim for IIED. *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 791 (Ky. 2004), *overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014). Due to this high threshold, "Kentucky courts have routinely granted summary judgments in favor of the defendant" on this claim. *Sacharnoski*, 187 F. Supp. 2d at 845.

Mere termination or demotion does not rise to the level of extreme and outrageous conduct that is required to sustain a claim for IIED in Kentucky. *Benningfield v. Pettit Envtl., Inc.*, 183 S.W.3d 567, 572 (Ky. Ct. App. 2005). Only when a termination or demotion is accompanied by extreme and egregious behavior on the part of the employer does an employee have a claim for IIED. *See Kroger Co. v. Willgruber*, 920 S.W.2d 61, 66 (Ky. 1996). In *Willgruber*, the Kentucky Supreme Court found that the employer's behavior was so extreme and outrageous that the plaintiff had a claim for IIED arising from his termination. In that case, one of the plaintiff's supervisors wrote fictitious bad performance reviews and attempted to force the plaintiff to sign a resignation letter with a possible severance package. *Id.* at 64. In order to receive the severance package, the plaintiff was required to sign a release that discharged the employer for any liability arising from its termination of the plaintiff. *Id.* As additional motivation to sign the release, two of the employer's officials promised the plaintiff a job as an assistant sales manager at one of the employer's plants in South Carolina. *Id.* The plaintiff flew all the way to South Carolina only to discover that the plant manager there, who made the hiring decisions, never authorized anyone to hire the plaintiff, and the plant did not have an assistant sales manager position. *Id.* These events caused the plaintiff to have a breakdown and to apply for disability benefits. *Id.* One of the employer's officials then attempted to prevent the plaintiff from receiving his disability benefits by providing false information to the disability insurance carrier. *Id.* When the carrier decided that it was obligated to pay the plaintiff, the employer's official demanded that the carrier put the plaintiff under surveillance. *Id.* The Kentucky Supreme Court found that under these extreme and outrageous circumstances, the plaintiff had a claim for IIED as the employer exerted pressure on the plaintiff in an effort to "bring [him] to his knees" and make him sign the release papers. *Id.* at 67. Additionally, the Court noted that the employer

had knowledge of the plaintiff's mental health difficulties and exploited them in an attempt to force him to sign the liability release. *Id.*

The facts of this case are distinguishable from those in *Willgruber*. In support of her claim, Ms. Marshall points to Mr. Bradshaw's allegedly hostile behavior at her demotion meeting and the lunch for successful analysts. (Docket No. 37 at 41-43.)  She also points to management's decision to move her desk location upon her demotion. *Id.* Lastly, Ms. Marshall highlights the meeting that she had with Mr. Elsner and Mr. Monyhan about her absence from her desk and the events leading up to her termination. *Id.* None of these alleged interactions or events rise to the "level of outrageousness necessary to establish a claim for [IIED]." *Simpson v. Lexington Fayette Urban Cty. Gov't*, No. 2002-CA-001856-MR, 2003 WL 22220255, at *10 (Ky. Ct. App. Sept. 26, 2003). Ms. Marshall has not provided any evidence to suggest that Rawlings engaged in acts that are "utterly intolerable in a civilized community." *Sacharnoski*, 187 F. Supp. 2d at 845. Rawlings' alleged actions were not designed to "bring [Ms. Marshall] to [her] knees" like those committed by the employer in *Willgruber*. Ms. Marshall may have been under pressure and felt uncomfortable but that is not enough to sustain a claim for IIED. Liability under a claim for IIED "clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities ..." *Sacharnoski*, 187 F. Supp. 2d at 845 (quoting Restatement (Second) of Torts § 46). Ms. Marshall has failed to provide any evidence that Rawlings' actions "went beyond all possible bounds of decency." Furthermore, Ms. Marshall has not provided sufficient evidence that anyone at Rawlings knew of or used their knowledge of her mental health issues to try to force Ms. Marshall to take an action like the plaintiff in *Willgruber*. Viewing the facts in the light most favorable to Ms. Marshall, this Court finds that her claim for IIED fails.

Conclusion

After a thorough examination of the parties' briefs and the record, the Court has concluded that while there are some *slight* factual discrepancies in the record, Plaintiff has not produced more than a scintilla of evidence to support her claims, and a jury could not reasonably find in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.") Consequently, for the aforementioned reasons, Defendant's Motion for Summary Judgment, (Docket No. 34), is GRANTED. An appropriate Order and Judgment will issue separate from this Memorandum Opinion.

cc: Counsel