UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:14-CV-00359-TBR

GLORIA MARSHALL,                                                    PLAINTIFF

v.

THE RAWLINGS CO., LLC,                                              DEFENDANT

## Memorandum Opinion & Order

This matter comes before the Court upon Motion by Defendant The Rawlings Company, LLC, ("Rawlings"), for judgment as a matter of law and, in the alternative, for a new trial and, in the alternative, for remittitur of the jury verdict. [DN 211.] Plaintiff Gloria Marshall, ("Marshall"), has responded, [DN 227], and Rawlings has replied. [236.] This matter is ripe for adjudication and the merits of Rawlings's motion are discussed below.

## A. Factual & Procedural Background

This case arises out of events which transpired during Marshall's term of employment at Rawlings from 2006 to 2013, where she worked as a workers compensation analyst, a Team Lead, and again as an analyst. Marshall suffers from depression, anxiety, and post-traumatic stress disorder, ("PTSD"), for which she took various periods of leave under the Family and Medical Leave Act, ("FMLA"), while working at Rawlings. Around the time Marshall was taking intermittent FMLA leave, she alleged that she suffered discriminatory and retaliatory treatment from certain individuals at the company, the culmination of which was her September 2012 demotion from Team Lead back to analyst, a lower position in the company's hierarchy, and her eventual termination from the company on October 1, 2013. More specifically, Marshall identified Laura Plumley, ("Plumley"), the President of the Workers Compensation department,

who made the decision to demote her; Vice President Jeff Bradshaw, ("Bradshaw"), who Marshall contended harassed her and held discriminatory and retaliatory biases against her; Division Director of the Workers Compensation department, Mike Elsner, ("Elsner"), who Marshall claimed also held discriminatory and retaliatory biases against her; and George Rawlings, ("Mr. Rawlings"), the President of the company, who made the decision to terminate Marshall and who Marshall claims did so unlawfully.

After Mr. Rawlings terminated her, Marshall filed suit, alleging FMLA interference/discrimination, FMLA retaliation, discrimination under the Americans with Disabilities Act, ("ADA"), and intentional infliction of emotional distress, ("IIED"). Initially, this Court granted summary judgment in Rawlings' favor on all of Marshall's claims. Upon review, the Sixth Circuit Court of Appeals affirmed this Court's judgment with respect to Marshall's claims for FMLA interference/discrimination and IIED, and reversed this Court with respect to her claims for FMLA retaliation and ADA discrimination. *See Marshall v. The Rawlings Co., LLC*, 854 F.3d 368 (6th Cir. 2017). A jury trial was held in this matter in March 2018 on Marshall's two remaining claims, at which time Rawlings prevailed on Marshall's claims of FMLA retaliation relating to her demotion and her termination; Marshall prevailed on her claims of ADA discrimination relating to her demotion and her termination. As a result, the jury awarded Marshall $456,000. This sum represented $81,000 (back pay), $75,000 (pain and suffering), and $75,000 (punitive damages) relating to her demotion; and $75,000 (front pay), $75,000 (pain and suffering), and $75,000 (punitive damages) relating to her termination.

On June 18, 2018, this Court granted Marshall's Motion for attorneys' fees and costs in the amounts of $226,015 and $5,080.25, respectively, after striking a few hours as being clerical work. Now, Rawlings has filed a Motion with the Court seeking three alternative forms of relief.

First, Rawlings seeks judgment as a matter of law in its favor under Rule 50(b) of the Federal Rules of Civil Procedure. Second, and in the alternative, Rawlings seeks a new trial under Rule 59(a). Third, and in the alternative, Rawlings seeks a remittitur of the $456,000 jury verdict. Marshall opposes all three forms of relief. The merits of Rawlings' requests are discussed below.

### B. Motion for Judgment as a Matter of Law

The first request for relief this Court will analyze is Rawlings' request for judgment as a matter of law pursuant to Rule 50(b).

### 1. Legal Standard

Rule 50(b) of the Federal Rules of Civil Procedure instructs that judgment as a matter of law may be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (citations omitted). In considering such a motion, the district court must view "the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences…." *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012) (quotation marks and citations omitted). More specifically, the district court should not itself weigh the evidence, nor question the credibility of any witnesses, and the court should not substitute its judgment for that of the jury. *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 597 (6th Cir. 2013). Then, the question must be asked if "there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Balsley*, 691 F.3d at 757. If so, the court should grant the motion.

### 2. Discussion

Rawlings presents three broad arguments regarding why, in its view, this Court should grant it judgment as a matter of law. The Court will deal with these arguments separately.

**a. The Elements of Marshall's Claim & the Issue of Pretext**

First, Rawlings argues that Marshall failed to raise an issue of material fact on the elements of her ADA discrimination claim, and that she further failed to establish or otherwise adduce any evidence of pretext on the part of Rawlings. Thus, in Rawlings' view, the available evidence is insufficient to support the findings made by the jury. Pursuant to the instruction this Court gave at trial, Marshall's ADA discrimination claim had five elements, all of which Marshall was required to prove by a preponderance of the evidence. Those elements are:

(1) that she "had a disability, as that term is defined under the ADA, or was 'regarded' by [Rawlings] as having a disability;"

(2) that Marshall "was otherwise 'qualified' to perform the 'essential functions' of her job with or without accommodation;"

(3) that Rawlings demoted and/or terminated Marshall;

(4) Rawlings "knew or had reason to know of [Marshall's] disability;" and

(5) Rawlings demoted and/or terminated Marshall "because of her disability." [*See* DN 189, at 13 (Jury Instructions).] *See also Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 433 (6th Cir. 2014) (citation omitted). Rawlings first contends that Marshall "provided no proof at trial that she was 'disabled,' as defined by the ADA, or that Rawlings regarded her as disabled; therefore, both the demotion and the termination claims fail as a matter of law since the evidence was insufficient to support a jury finding." [DN 221-1, at 5.]

Pursuant to 42 U.S.C. § 12102, the term "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual." Relatedly, the statute provides a non-exhaustive list of "major life activities," which includes "caring for oneself, performing manual tasks, seeing, hearing, eating," and things such as

"concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "Major bodily functions" also qualify as "major life activities," which include things such as immune system functionality and neurological and brain functions. 42 U.S.C. § 12102(2)(B). The statute also explains that an individual may qualify under this provision if they are *regarded* as having such an impairment. 42 U.S.C. § 12102(1)(C). "An individual meet[s] th[is] requirement…if the individual establishes that…she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

Rawlings contends that no proof was put on at trial which tended to show that Marshall's depression, anxiety, or PTSD "substantially limit[ed] one or more major life activities," pointing principally to an alleged lack of impact these ailments had on her work. [DN 211-1, at 5-6.] However, the "substantial limitation" term in 42 U.S.C. § 12102 is not as narrow as Rawlings' argument tends to suggest. This Court's sister court in the Western District of Tennessee explained the issue succinctly:

> [t]he determination of whether a plaintiff's impairment 'substantially limits' a major life activity requires an individualized assessment that compares the person's ability to perform the activity as compared to most people in the general population. EEOC regulations seek to make this process more 'predictable, consistent, and workable' by listing specific impairments and the life activities that they commonly impact. These impairments will 'virtually always be found to impose a substantial limitation on a major life activity.' Regarding Plaintiff's impairments, 'it should easily be concluded that…major depressive disorder…substantially limit[s] brain function.

*Williams v. AT & T Mobility Servs., LLC*, 186 F. Supp. 3d 816, 825 (W.D. Tenn. 2016). Also of importance is the fact that, "[u]nder the amended statute, both the definition of 'disability' and the term 'substantially limit' are to be construed in favor of broad coverage. *Id.* at 824 (citing 42 U.S.C. § 12102(4)(A)). Marshall specifically testified about her depression, anxiety, and PTSD,

the problems that it caused her in her everyday life, and the inpatient and outpatient care she required as a result of it. The Court finds that the jury had a "legally sufficient evidentiary basis" to find that Marshall qualified as a disabled individual under the meaning of the statute. *See Imwalle*, 515 F.3d at 543. Because the Court has determined that the evidence was sufficient for a reasonable jury to have concluded that Marshall was a person with a "disability" for purposes of the ADA, it need not reach the issue of whether Rawlings regarded her as being a person with a disability, mistakenly or otherwise.

Rawlings next argues that "[t]he undisputed proof at trial established that [Marshall] was not qualified to perform her job as Team Lead in 2012, therefore the demotion claim fails as a matter of law." [DN 211-1, at 8.] Marshall was working as an analyst in the workers compensation division at Rawlings before being promoted to Team Lead, a position in which she oversaw a team of workers compensation analysts; in September 2012, she was demoted back to analyst, before ultimately being terminated in October 2013. A Team Lead oversees a group of analysts, providing them with work-related guidance, and also has a reduced quota of workers compensation files they are required to work through for the company. Rawlings points out that, "[a]t the time of her demotion, more than six months after returning from FMLA leave, [Marshall] carried" far fewer files than normal and was still having difficulty keeping up, and that Marshall was simply incapable "of meeting the leadership requirements of the Team Lead position." [*Id.* at 10-11.]

Of course, as the Sixth Circuit has explained, "[a]t the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (citation omitted). And here, the Court finds that sufficient evidence was adduced at trial from which a

reasonable jury could have found for Marshall on this prong of her ADA discrimination claim. *See Imwalle*, 515 F.3d at 543. Namely, while Rawlings points in large part to the notion that, "in Rawlings' opinion, [Marshall] was not capable" of meeting expectations in her leadership position, the inquiry is an objective one, and so Rawlings' opinion here is not dispositive. Moreover, to the extent that Rawlings has utilized objective data showing that Marshall was apparently incapable of keeping up with her caseload, even when it was reduced, this remains insufficient for the Court to determine as a matter of law that, drawing all reasonable inferences in favor of Marshall, that she was unqualified for the position of Team Lead. *See Balsley*, 691 F.3d at 757. Rawlings cites to small sample sizes concerning her backlog of cases, repeatedly makes statements such as, "in Rawlings' business judgment," and largely ignores the second facet of the position of Team Lead: helping other analysts. [*See* DN 211-1, at 10-11.] To be sure, the evidence adduced by Rawlings shows that, at the time Marshall was demoted, her backlog had reached 43%, and that Rawlings' set limit was 15%, but the Court finds that it is far from certain that these figures, while unfavorable, demand the unequivocal conclusion that Marshall was unqualified for her job as a Team Lead. It raises some questions, but the Court cannot say that the jury reached an unreasonable result and, at any rate, this Court is prohibited from weighing the evidence presented by both sides. Reasonable minds could have reached a conclusion in favor of Marshall, and so this argument must fail.

Next, Rawlings argues that Marshall failed to show intentional discrimination by Rawlings because, in Rawlings view, it "treated [Marshall] the same as its other employees…." [*Id.* at 13.] More specifically, Rawlings argues that Marshall never showed any disparate treatment because she failed to identify valid "comparators," *i.e.*, similarly situated but non-disabled Rawlings employees who received more favorable treatment than her. [*Id.* citing

*Stanciel v. Donahoe*, 570 F. App'x 578, 581 (6th Cir. 2014).] However, as Marshall points out, the jury *did* hear the testimony of Elizabeth Davidson Estrada, ("Estrada"). [DN 195 (Transcript of Estrada's Testimony).] Estrada discussed a request she made to her boss, Leah Sarley, ("Sarley"), while acting as a Team Lead to be taken off file rotation in order to catch up, a request which Sarley granted. [*Id.* at 9.] She also clarified that she was not taking any FMLA leave around that time. [*Id.*] At trial, Marshall juxtaposed this treatment with a perceived failure by Sarley to provide similar treatment for Marshall around the time Marshall was taking FMLA leave. Rawlings may disagree with the weight that a jury should have attached to such comparator evidence, but the Court will not herein weigh the evidence a second time. *See Szekeres*, 731 F.3d at 597. Reasonable minds could have found in Marshall's favor.

### b. Cats Paw Theory of Liability

Rawlings' next broad-brush argument concerns the so-called Cats Paw theory of liability, upon which Marshall's case was premised at trial. In affirming this Court in part and reversing it in part, the Sixth Circuit explained that "[t]he term 'cat's paw' refers to one used by another to accomplish his purposes. In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Marshall*, 854 F.3d at 377 (quoting *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006)). In other words, the theory "rests on the premise that organizational employers do not operate in a vacuum, and that a decisionmaker might rely on the recommendation of a biased lower-level supervisor." *Id.* at 380. In the situation where a non-decisionmaker intentionally manipulates the decisionmaker, thereby invoking the Cats Paw

theory, "the honesty or sincerity of the decisionmaker's belief is irrelevant. What is relevant is that the belief is rooted in a biased recommendation." *Id.* (citation omitted).

Here, Rawlings claims that Marshall failed to put on evidence concerning the elements of "bias" and "intentional manipulation" relating to both her demotion and termination, and that her claims must therefore fail as a matter of law. More specifically, Rawlings contends that (1) no evidence was adduced that Bradshaw knew about Marshall's ailments at the time her demotion, and so he could not have intentionally manipulated the decisionmaker, Plumley, into deciding to demote Marshall; and that (2) no evidence was adduced that Elsner, Bradshaw, or Plumley intentionally manipulated Mr. Rawlings into terminating Marshall because of her ailments. [*See* DN 211-1, at 17-22.]

Plumley testified at trial that her decision to demote Marshall from Team Lead back to analyst was made, at least in part, based upon a recommendation from Bradshaw; she testified that Bradshaw told her that "Marshall was having difficulty with her individual performance and balancing it with the role of a team lead." It is Rawlings' contention, though, that Bradshaw's recommendation was made solely upon his sincerely held belief that Marshall was not performing her job duties adequately, and not out of some animus. Relatedly, Bradshaw testified that he was unaware of Marshall's specific ailments when he recommended her demotion. However, the jury heard evidence that Elsner forwarded emails to Bradshaw during the relevant time period in which Marshall informed Elsner that she was taking FMLA leave and was admitted to the hospital. The jury also heard evidence that Marshall told Elsner all about her ailments during the relevant time period, and that Elsner sent an email to Bradshaw expressing his concerns about Marshall. There was no direct evidence adduced that Elsner told Bradshaw about the specifics of Marshall's ailments, *i.e.*, that she was suffering from depression, anxiety

and PTSD, but the Record contains enough circumstantial evidence concerning the events which transpired immediately before Marshall's demotion that the Court finds that it must reject Rawlings' argument. The Court cannot "question the credibility of any witnesses," as that is a job with which the jury was charged, and which it did. *Szekeres*, 731 F.3d at 597. Nor should a court "substitute its judgment for that of the jury," *id.*, and the Court cannot say that "reasonable minds could come to but one conclusion in favor of [Rawlings,]" and so this argument must fail. *See Balsley*, 691 F.3d at 757.

Next, Rawlings argues that no evidence was adduced that Elsner, Bradshaw, or Plumley intentionally manipulated Mr. Rawlings into terminating Marshall because of her ailments. Here, too, the Court must reject Rawlings' arguments. Rawlings contends that Marshall was terminated because she had a "bad attitude," and "not 'because of' her mental health conditions." [DN 211-1, at 22.] Of course, the basic premise of the Cats Paw theory of liability means that Mr. Rawlings' beliefs, feelings, and reasons for actually terminating Marshall were not dispositive, as the Cats Paw theory looks to the biases held by the non-decisionmakers and their intentional manipulation of the ultimate decisionmaker. *See Marshall*, 854 F.3d at 380. Rather, Rawlings argues that the Record is bare of any evidence that Elsner, Bradshaw, and/or Plumley held biases against Marshall, which would have guided them to manipulate Mr. Rawlings into terminating Marshall.

In making this argument, Rawlings discounts the aforementioned emails containing information about Marshall's health that Elsner forwarded along to Bradshaw, coupled with his email to Bradshaw expressing his doubts about Marshall's ability to continue as a Team Lead. Rawlings also largely side-steps the evidence Marshall put on concerning Bradshaw's behavior towards Marshall at the May 2013 luncheon and the comments he made to her around the time of

her demotion, which Marshall conveyed to the jury as evidence of his bias against her. Rawlings does discuss at length Marshall's allegations of harassment against Bradshaw. It explains the conflicting views of his behavior towards Marshall, namely, that Marshall felt Bradshaw was harassing her in 2013 and that this served as a catalyst for her ultimate termination, and that Plumley felt the allegations were not serious enough to constitute harassment and Mr. Rawlings did not truly believe everything that Marshall was saying in their October 1, 2013 meeting immediately before he terminated her. However, this only serves to highlight the factual disputes put into evidence throughout the course of the trial. It is not for this Court to weigh the evidence and decide which side was more believable. *Szekeres*, 731 F.3d at 597. That is a function the jury already carried out, and the Court cannot say the only reasonable conclusion for the jury to have reached was one in favor of Rawlings. Accordingly, the Court must reject this argument.

### c. Rawlings' Legitimate, Non-Discriminatory Reason for the Demotion and Termination

Next, Rawlings argues that, consistent with the *McDonnell Douglas* burden-shifting framework, it provided the jury with evidence of a legitimate, non-discriminatory reason for demoting and terminating Marshall, and that Marshall failed to rebut this reason with any evidence of pretext. Under *McDonnell Douglas*, the burden rests with the plaintiff to establish a prima facie case of discrimination; if done, the burden shifts to the defendant employer "to articulate some legitimate, nondiscriminatory reason" for taking the adverse employment action(s); if done, the burden shifts back to the plaintiff to show that the employer's reason is actually pretext for some unlawful discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003) (citation omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Rawlings correctly points out that "[a] plaintiff can demonstrate pretext by showing that the employer's proffered reason for the adverse action (1) has no basis in fact, (2) did not

actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (citations omitted).

First, with respect to Marshall's demotion, Rawlings argues that "the evidence showed that [Marshall] was demoted for her poor performance as a Team Lead…." [DN 211-1, at 32.] The Court already discussed the evidentiary dispute between the parties concerning her work-related performance in Section (B)(2)(a) of this Memorandum Opinion, at which time Rawlings argued that the evidence showed Marshall was not qualified for her position as Team Lead. The Court's analysis in that section serves to dispense with Rawlings' argument here. Rawlings adduced evidence that Marshall was having difficulties with her caseload and was falling behind, characteristics of an individual who may or may not be qualified for a position depending upon how lengthy that period of time is, but it is not for the Court to weigh the significance of such a specific factual issue, because Marshall adduced evidence that Elsner knew of her ailments and forwarded emails to Bradshaw which indicated that Marshall was on FMLA leave. In other words, Marshall adduced evidence of pretext utilizing prongs two and three of the above-listed methods from *Jackson*, 814 F.3d at 779.

Second, Rawlings argues that 'the evidence showed that [Marshall] was…terminated by Mr. Rawlings for her bad attitude." [DN 211-1, at 32.] Again though, this is just Rawlings' take on what was very much a contested issue at trial. To be sure, Rawlings' proffered reason for Marshall's termination, her "performance and false allegations of harassment," constituted a legitimate, non-discriminatory reason for Mr. Rawlings' decision to fire her. However, Rawlings' next argument that Marshall "did not supply evidence of pretext at trial" is not a conclusion necessarily borne out of the Record. [*See id.*] Much of the evidence Marshall adduced

throughout the course of the week-long trial went directly to the question of her competence as an analyst and a Team Lead, her caseload, the amount of money she produced for the company, as well as her allegations of harassment against Bradshaw. Stated differently, Marshall produced testimony concerning her abilities as an employee while Rawlings did the same regarding her shortcomings; Marshall adduced evidence concerning the perceived harassment she received at the hands of Bradshaw and the indelicate handling of information concerning her mental health and potential biases from Elsner, Bradshaw and Plumley, while Rawlings adduced evidence that her ailments were not the rationale for her demotion and termination. In short, Marshall produced some evidence that her supposed "bad attitude" and/or her allegedly false allegations of harassment "did not actually motivate" Mr. Rawlings' decision to terminate her, and/or that these incidents were "insufficient to warrant" her termination. *See Jackson*, 814 F.3d at 779. Finally, it bears repeating that it would be inappropriate for the Court here to substitute its own judgment for that of the jury concerning which party produced more compelling evidence and, viewing the evidence in the light most favorable to Marshall as this Court is required to do, the Court must reject Rawlings' argument. *See Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 509-10 (6th Cir. 2016).

### C. Motion for New Trial

The first form of alternative relief Rawlings seeks in the instant Motion is a new trial under Rule 59(a) of the Federal Rules of Civil Procedure.

### 1. Legal Standard

Pursuant to Rule 59(a), a new trial may be granted in an action involving a trial by jury "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A new trial is warranted only "when the jury reaches a

'seriously erroneous result as evidenced by (1) the verdict being against the [clear] weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice of bias.'" *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 509 (6th Cir. 2013) (quoting *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 414 (6th Cir. 2012), *aff'd*, 572 U.S. 118 (2014)). Importantly, the district court may not set aside a verdict "simply because it believes that another outcome is more justified;" rather, the court must "accept the jury's verdict 'if it is one which reasonably could have been reached.'" *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007) (quoting *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967)).

## 2. Discussion

In support of its alternative request for a new trial under Rule 59(a), Rawlings has presented three broad-brush arguments, which the Court will deal with in succession, below.

### a. The Weight of the Evidence at Trial

Rawlings first argues that the verdict was against the clear weight of the evidence, and cites to five specific reasons why a new trial is warranted: first, according to Rawlings, Marshall failed to establish that she was disabled or that Rawlings regarded her as disabled under the ADA; second, Rawlings contends that Marshall presented no evidence that she was qualified for her position as a Team Lead; third, Rawlings contends that Marshall "presented no proof of a similarly situated comparator or that Rawlings treated her differently than other employees in general;" fourth, Rawlings argues that the verdict the jury reached on the Cats Paw theory was unsupported by any evidence of intentional manipulation of Plumley or Mr. Rawlings by either Bradshaw or Elsner; and fifth, Rawlings argues that Marshall did nothing to rebut its legitimate, non-discriminatory reasons for demoting and terminating her. [*See* DN 211-1, at 35.] Rawlings'

argument here largely tracks its earlier arguments in the preceding section wherein it contended that it was entitled to judgment as a matter of law pursuant to Rule 50(b).

First, the Court has given adequate consideration to the issues of whether Marshall was a person with a "disability" under the meaning of the ADA, as well as whether she was qualified to perform her job as a Team Lead in Section (B)(2)(a), *supra*. Contrary to Rawlings' assertion, Marshall *did* present evidence at trial that she was a person with a "disability," as testimony was elicited during the trial that she suffers from depression, anxiety and PTSD, ailments for which she was forced to take intermittent FMLA leave from work, and for which she was also hospitalized. Rawlings focuses most heavily on whether and how much work Marshall was forced to miss as a result of her ailments, but the Court is satisfied that sufficient evidence was adduced by Marshall that her ailments substantially limited a major bodily function such that the jury's verdict "is one which reasonably could have been reached." *Denhof*, 494 F.3d at 543 (internal quotation marks omitted). Additionally, the conclusion that Marshall was "qualified" for her position as Team Lead was one the jury could have reasonably reached, *Denhof*, 494 F.3d at 543, as the jury heard evidence of Marshall's track record as an employee, both with respect to interpersonal skills as well as the amount of money she produced for Rawlings.

Next, this Court already gave sufficient consideration to the issues of similarly situated comparator employees at Rawlings, as well as the issue of the Cats Paw theory of liability, discussing these issues at length in Sections (B)(2)(a)-(b), *supra*. The Court examined Estrada's testimony as compared to Marshall's own testimony. Further, it looked at the issues of evidence concerning "bias" and "intentional manipulation," and Rawlings' legitimate, non-discriminatory reasons for demoting and terminating Marshall and her rebuttal thereof. The Court hereby incorporates that analysis by reference. The Court cannot say that the verdict reached by the jury

was a "seriously erroneous result as evidenced by…the verdict being against the [clear] weight of the evidence…. *Cummins*, 727 F.3d at 509. Accordingly, Rawlings' arguments must be denied.

### b. Coloring the Jury on the Basis of Passion and not the Law

The second argument Rawlings has presented in support of its contention that it is entitled to a new trial is that counsel for Marshall made "improper arguments" that "colored the jury to decide the case on the basis of passion, not the law." [DN 211-1, at 35.] Rawlings points to numerous statements Marshall's counsel made during trial, characterized by Rawlings as

> comments about how Rawlings treats its employees unfairly, how their business practices purposefully disadvantage their employees/clients and – because of the evils of the corporation itself – how the jury is the voice of the community and can send a message to 'fix' the company, in addition to making things right for other Kentucky workers.

[*Id.* at 36-37.] Essentially, Rawlings has compiled numerous excerpts from trial and argues that these constituted attempts by Marshall's counsel to skirt the legal requirements of an ADA discrimination claim and have the jury focus more on *any* wrong done to Marshall, and to remedy *any* unfairness she may have experienced irrespective of what the law said. [*See id.* at 38.][1]

The Sixth Circuit has long held that "the determination of the extent of permissible comment and argument by counsel rests primarily in the judicial discretion of the lower court," and that "[t]he trial court is…clothed with a great deal of discretion in determining whether an objectionable question is so prejudicial as to require a retrial…[because] [it] is in a far better position to measure the effect of an improper question on the jury than an appellate court…."

---

[1] Rawlings argues, "[t]hus, the Plaintiff's clear request to the jury – as evidenced by those comments and others throughout trial – was that if you do not like how Rawlings treated Plaintiff, regardless of whether or not it was 'because of' her mental health conditions, you can fix that 'wrong' by sending a message. These comments had no bearing on whether or not Rawlings would have demoted and/or terminated Plaintiff 'but for' her medical condition. Instead, Plaintiff blatantly asked the jury to right any unfairness or wrong done to her – irrespective of the reason."

*City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980) (internal

quotation marks and citations omitted). In conducting such an examination, the trial court must

ask "whether there is a reasonable probability that the verdict of a jury has been influenced by

improper conduct," and then "examine, on a case-by-case basis, the totality of the circumstances,

including the nature of the comments, their frequency, their possible relevancy to the real issues

before the jury, the manner in which the parties and the court treated the comments, the strength

of the case…, and the verdict itself." *Id.*

At the outset of the Court's analysis of Rawlings' argument, it is necessary to note that

Rawlings seems to have made no contemporaneous objections to the twelve principal excerpts it

has included in its Motion (three excerpts from Marshall's opening statement, one piece of

dialogue from the direct examination of Marshall, and eight excerpts from Marshall's closing

argument). [*See* DN 211-1, at 37-38.] The only contemporaneous objection made by Rawlings

with respect to these excerpts is one during Marshall's closing argument, but the objection did

not go to the issue of inflaming the jury's passion: counsel for Marshall was discussing the issue

of punitive damages, and counsel for Rawlings objected and asked to approach the bench. At that

time, Rawlings' counsel stated, "[j]ust for the record, we do object to the request for punitive

damages…I think the case law says that when she's doing her closing, we have to object." [DN

198, at 18.] During this bench conference, nothing was said about improperly appealing to the

jury's passions, and Rawlings' counsel did not specifically make reference to any of the excerpts

contained in Rawlings' instant Motion.

Therefore, setting aside the substance of these twelve excerpts, the Court must first look

to the consequences of Rawlings' failure to contemporaneously object. In *Balsley v. LFP, Inc.*,

the Sixth Circuit dealt with, *inter alia*, a Rule 59 motion for a new trial, wherein the defendant

argued "that comments made by Plaintiffs' counsel in its opening statement and closing argument were improper and prejudicial," as Rawlings as done here. *See Balsley*, 691 F.3d at 761. In upholding the district court's decision to deny the defendant's motion, the *Balsley* Court explained that "[t]he failure to object to the allegedly prejudicial comments at trial 'raise[s] the degree of prejudice which must be demonstrated in order to get a new trial on appeal.'" *Id.* at 761-62 (quoting *Strickland v. Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998)). Thus, because Rawlings "failed to object to…the[se] statements," Rawlings "is subject to a heightened showing of prejudice…" with respect to these twelve excerpts. *Id.* at 762.

Turning attention to the specific excerpts to which Rawlings now objects, some of them include some variation of the word "fair." [*See* DN 211-1, at 37.] For example: "ask yourself, is that fair," or "ask yourself whether that's fair," or "it's…fundamentally a fairness issue." Other excerpts refer to "send[ing] a message." Still others refer to the power of the jury: "you are a voice that they have to listen to," and "the other message you can send them is that there's nothing wrong with what they do," and "the hope that you give to this company and its employees and companies just like it all across…Kentucky," and "I'm asking you to use that power to send that message and I am asking you as a person who represents workers in Kentucky, do not send them the message that what they did and what they continue to do is okay. It's not, but that depends on you." In examining these twelve excerpts, the Court finds that Rawlings cannot meet the heightened standard of prejudice required for this Court to grant a new trial.

With respect to the comments concerning fairness made by Marshall's counsel during her opening statement, the Court has reviewed the transcript and finds that the comments were made largely in the context of Marshall's experience with the company, the treatment she alleged she

received during and after taking FMLA leave, how Mr. Rawlings treated her when she levied a harassment complaint against Bradshaw, and Mr. Rawlings' decision to terminate Marshall without conducting any substantive investigation into the aforementioned allegations. In short, the Court cannot say that these comments, even using the term "fair," were intentionally directed towards inflaming the jury's passion, nor has Rawlings shown that they had such an effect.

Next, with respect to the complained-of exchange between Marshall's counsel and Marshall on direct examination, the Court must reject Rawlings' argument. That exchange, in its entirety, is as follows:

Q:    Do you think this jury should send a message?

A:    Absolutely, That's – that's the reason why I have gone through all of this litigation effort is to try to show that maybe everyone has to play by the rules, not just people that don't have millions and millions of dollars to spare.

Q:    So that last figure there, what is that?

A:    300,000.

Q:    Is that what you'd like to see the jury award in order to send a message?

A:    Yes.

[DN 176, at 96-97.] The Court finds that no prejudice resulted to Rawlings as a result of this exchange. Marshall was discussing the damages (compensatory and punitive) that she was requesting at trial, as well as her belief that (a) Rawlings discriminated and/or retaliated against her, and (b) that they should be subject to the laws like everyone else, and the phrase "send a message" appears to have been directed towards her request for punitive damages which, as the term suggests, are punitive in nature and are awarded in order to punish a badly behaving actor.

Regarding emotional dialogue and what Rawlings refers to as "us versus them" lines of argument provided by Marshall's counsel during her closing argument, the Court finds that a new trial is not warranted. Marshall's counsel at one point referred to a piece of testimony that "got [her] emotions up," which the Court finds to be ultimately irrelevant to Rawlings' argument here. And with respect to Marshall's counsel's comments to the jury that it was "a voice that they [Rawlings] have to listen to," that the jury could send a message that Rawlings needs to fix its bad practices, or send a message that there's nothing wrong with what it did, that Rawlings has approximately 1,400 employees who might be at risk of discrimination and/or retaliation like Marshall and that the jury could help them, and the other comments to which Rawlings objects, the Court finds no heightened prejudice warranting a new trial.

A key part of Marshall's counsel's trial strategy was the pursuit of punitive damages under the ADA, and the Court sees many of these comments as directed towards the jury in order to instruct them that they had the power to punish Rawlings for bad behavior. It is certainly "true that an 'us-against-them' plea can have no appeal other than to prejudice by pitting the community against a nonresident corporation and is an improper distraction from the jury's sworn duty to reach a fair, honest and just verdict." *Strickland*, 142 F.3d at 359 (internal quotation marks and citations omitted). However, even where there is "an 'us-against-the-powerful-corporation' flavor to [a] Plaintiff's closing remarks," it does not automatically follow that such an incident is "so prejudicial as to mandate a new trial, especially where no objection was raised at the first trial." *Id.* Thus, even to the extent that Marshall's counsel's comments juxtaposing employers and employees could be construed as minimally "us-against-them" in its "flavor," the Court is satisfied that the comments, reviewed anew, do not rise to a level sufficient

to warrant the granting of a new trial, especially considering that Rawlings did not specifically object to these comments at trial. *See id.*

Next, Rawlings cites to four additional excerpts, calling them "irrelevant topic areas [that] were obviously meant to trap a witness into an unfavorable answer, thereby inflaming the jury…." [DN 211-1, at 39.] Upon reviewing the transcripts relating to these instances, the Court does not see how these pieces of dialogue would have inflamed the jury's passions, or how they were at all unfairly prejudicial to Rawlings. Even if potentially irrelevant, none of the excerpts at issue are of a character which would warrant consideration of a new trial.

Rawlings also objects to Marshall's counsel's repeated references to Elsner's forwarding to Bradshaw of three emails Marshall had sent to him. [*Id.*] There were arguments at trial regarding whether the information contained in these emails was confidential health information, but the emails themselves did refer to Marshall and her being on FMLA leave, and so whether or not Marshall's counsel "fixated on…[the] three emails," for a unnecessary amount of time, as Rawlings insists, does not ultimately bear upon the prejudice question. Of course, Rawlings has objected to Marshall's counsel's allegedly excessive use of the emails as the latter's attempt to unfairly characterize Elsner's actions as violating regulations or internal company policy, but the Court has reviewed the transcript and finds that in-trial objections and this Court's directing of Marshall's counsel served to cure any potential prejudice to Rawlings.

Finally, Rawlings cites to this Court's statement on the Record during Rawlings' motion for directed verdict at the close of Marshall's proof. [DN 201.] Therein, this Court stated on the Record that, with respect to the ADA discrimination claim, it believed Rawlings had a stronger argument than Marshall. [*Id.* at 17.] However, the Court went on to say, "but the proof [the Court has] heard is very similar, if not stronger, than what went up to the Court of Appeals," before

denying Rawlings' motion. Of course, this motion was heard while the jury was not present in the courtroom and, at any rate, the jury is the ultimate fact finder. Thus, Rawlings' attempt to connect this comment with its ultimate conclusion that the jury found in favor of Marshall only on her claim for ADA discrimination because it provided for a larger recovery than her claim for FMLA retaliation could offer, is without merit.

### c. The Jury Instructions

Rawlings also contends that a new trial is warranted on the basis of what it views as errors concerning the jury instructions given at trial. Specifically, Rawlings argues that this Court should grant it a new trial because (1) the Court failed to include specific language directed to the *McDonnell Douglas* burden-shifting analysis, and (2) the Court did not provide an instruction concerning the business judgment rule. [DN 211-1, at 41; *see also* DN 197, at 14-17.]

During trial, Rawlings objected to this Court's decision not to include specific language discussing the burden-shifting approach of *McDonnell Douglas* in the jury instructions, and the Court explained that the instructions, as written, incorporated the rule and spirit of *McDonnell Douglas* "in a way that [wa]s less confusing to the jury," because "when you say they've [plaintiff] carried their burden and then you rebut – I think that becomes – that's legalese for summary judgment motions but not necessarily for jur[ies]…." [DN 197, at 17.] Of course, the Sixth Circuit "has discussed [that] 'it is normally *inappropriate* to instruct the jury on the *McDonnell Douglas* analysis.'" *Beard v. AAA of Michigan*, 593 F. App'x 447, 453-54 (6th Cir. 2014) (quoting *Brown v. Packaging Corp. of Am.*, 338 F.3d 586, 593 (6th Cir. 2003) (emphasis added)). Trial courts are afforded broad discretion concerning which instructions to provide to a jury, *United States v. Tasis*, 696 F.3d 623, 627 (6th Cir. 2012), and such "[i]nstructions are not erroneous if 'they adequately inform the jury of the relevant considerations and provide a basis

in law for aiding the jury in reaching its determination.'" *EEOC v. EMC Corp. of Massachusetts*, 205 F.3d 1339 (Table), at *10 (6th Cir. 2000) (quoting *Kitchen v. Chippewa Valley Sch.*, 825 F.2d 1004, 1012 (6th Cir. 1987)).

In the present case, the Court is satisfied that the instructions were adequate. While the Court did not lay out the instructions at issue in precisely the same fashion as Rawlings would have wished, upon reexamination the Court finds that their meaning, both explicitly and implicitly, reach the issues in a manner sufficient to preclude a new trial. In Instruction Nos. 6 and 7, wherein this Court laid out the five required elements of an ADA discrimination claim relating to Marshall's demotion and termination, respectively, it specifically stated that Marshall must have been demoted/terminated **"because of her disability." [**DN 189, at 13 (bold in original).] The Court then provided over a page of explanations for both her demotion claim and her termination claim. Therein, this Court explained direct discrimination and discrimination under the Cats Paw theory, targeting the key issues inherent in Marshall's claims. For example, in charging the jury on direct discrimination concerning her demotion, the Court explained that the decision to demote Marshall must have been "the 'but for case' of Laura Plumley's decision to demote her. In other words, the sole reason why Laura Plumley decided to demote the Plaintiff was her disability or Laura Plumley's having regarded her as having a disability." [*Id.* at 13-14.]

The Court went on to specifically charge the jury concerning intentional manipulation under the Cats Paw theory and explained the motivations certain individuals must have had in order for the jury to find in favor of Marshall on these claims. For example, when charging the jury on the Cats Paw theory, the Court specifically guided the jury by instructing as follows: "[u]nder Theory Two ('Cat's Paw'), you the jury must ask this question: whether the Plaintiff has proven by a preponderance of the evidence that Jeff Bradshaw and/or Mike Elsner, *because*

23

*of* the Plaintiff's disability or their having regarded her as having a disability, *intentionally manipulated* the decision maker, Laura Plumley, in her decision to demote the Plaintiff." [DN 189, at 14 (emphasis added).] In other words, the jury was asked, in its position as fact finder, to determine what guided the decisions that were made, *i.e.*, whether they were guided by intentionally manipulative biases borne out of knowledge of Marshall's disability, or whether the decisions stemmed from Marshall's perceived or actual shortcomings in her role as Team Lead and/or her attitude and her allegedly false harassment claims. After explaining the actual motivations that certain Rawlings employees must have had in order for Marshall to succeed under both theories, and on one or both of her claims, the Court properly instructed the jury that, should they find in favor of Marshall on all five elements, then Marshall must prevail. The Court finds these instructions to be adequate, and that additional instructions concerning pretext would have been largely redundant and therefore unnecessary, as the Court's explanation of what mindsets were required in order for the jury to find for Marshall were sufficient.

Rawlings also argues that a business judgment instruction should have been given by the Court. This Court's sister court in the Eastern District of Tennessee explained this issue clearly:

> Defendant also contends that the Court committed error in omitting an instruction on the business-judgment rule in the jury charge. The Sixth Circuit has provided, however, that it 'has never adopted a 'business-judgment rule' which requires [it] to defer to the employer's 'reasonable business judgment' in discrimination cases. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 395 n.6 (6th Cir. 2008) (stating in the context of a Title VII claim). Indeed, the issue in most discrimination cases is 'whether the employer's adverse employment action resulted from an objectively unreasonable business judgment.' *Id.* As such, it is inappropriate to 'unquestionably accept the employer's own self-serving claim that the decision resulted from an exercise of reasonable business judgment.' *Id.* Instead, the jury should determine whether a plaintiff has presented enough evidence 'that the employer made an unlawful business decision.

*EEOC v. Dolgencorp, LLC*, 277 F. Supp. 3d 932, 950 (E.D. Tenn. 2017) (quoting *White*, 533 F.3d at 395 n.6).

Throughout the life of this case, and through the evidence adduced at trial, the central questions with respect to Marshall's ADA discrimination claims have been (1) whether she was demoted because of some discriminatory animus concerning her disability or because she was seen by the company to be unqualified for a leadership role, and (2) whether she was terminated from the company because of that discriminatory animus or because she had a bad attitude and/or made allegedly false claims of harassment against Bradshaw. Upon reexamination of the instructions given to the jury, the Court has determined that the instructions sufficiently covered these two issues; they carefully laid out the legal standards and what the jury was required to find in order to find in favor of Marshall. Consequently, the Court's decision to omit a specific instruction on the business judgment rule was not in error, and is therefore not a basis upon which the Court would order a new trial.

### D. Motion for Remittitur

The final form of alternative relief Rawlings seeks in its instant Motion is a remittitur of the jury award.

### 1. Legal Standard

"A remittitur is defined as '[t]he procedural process by which an excessive verdict of the jury is reduced.'" *Hill v. Marshall*, 962 F.2d 1209, 1216 (6th Cir. 1992) (quoting *Black's Law Dictionary*, 1295 (6th ed. 1990)). The Sixth Circuit "has determined a jury verdict should not be remitted by a court 'unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.'" *Gregory v. Shelby Cnty., Tennessee*, 220 F.3d 433, 443 (6th Cir. 2000) (quoting *Jackson v. City of Cookeville*, 31 F.3d 1354, 1358 (6th Cir. 1994)). The Sixth Circuit has also held that "an award must stand unless it is (1) beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a

mistake." *Id.* (citing *Bickel v. Korean Air Lines Co., Ltd.*, 96 F.3d 151, 156 (6th Cir. 1996)). "A trial court is within its discretion in remitting a jury verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court." *Id.* (citing *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1391 (6th Cir. 1990)).

## 2. Discussion

Finally, Rawlings has asked that, in the alternative, this Court should remit the jury's verdict of $456,000 as unreasonably excessive. [DN 22-1, at 43.] Rawlings first argues that "[t]he back pay award on the demotion claim is not supported by the proof," and that, barring the grant of a new trial, the Court should reduce the $81,000 award to $23,400. [*Id.* at 44.] As this Court instructed the jury, back pay refers to the compensation an employee would have earned if the employer had not taken unlawful adverse action against the employee. [DN 189, at 24.] Any award of back pay should be reduced by wages gained from other employment in the interim period, as well as expenses the plaintiff would have incurred through maintaining their employment with the defendant company. [*Id.*] As the Sixth Circuit has explained, "[t]he purpose of back pay 'is to make whole the victim of an unlawful employment practice by restoring the employee to the position he or she would have been in absent the discrimination.'" *Szeinbach v. Ohio State Univ.*, 820 F.3d 814, 821 (6th Cir. 2016) (quoting *Howe v. City of Akron*, 801 F.3d 718, 744 (6th Cir. 2015)). The Sixth Circuit will reverse a trial court's "grant…of back pay upon a showing that the district court abused its discretion in fulfilling the purposes of Title VII." *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 840 (6th Cir. 1994) (citing *Albemarle v. Moody*, 422 U.S. 405, 424 (1975)).

The Sixth Circuit has made clear that "[v]ictorious Title VII plaintiffs are presumptively entitled to back pay until the date judgment has been entered in the case." *Shore v. Federal Express Corp.*, 777 F.2d 1155, 1159 (6th Cir. 1985). In its instant motion, Rawlings contends that the calculation should only run from September 2012, when Marshall was wrongfully demoted, until September 2013 when she was wrongfully terminated (Marshall was actually terminated on October 1, 2013). However, the jury was specifically charged that back pay runs from the date of the adverse action (here, her demotion) until the rendering of the verdict, which is consistent with Sixth Circuit precedent. [DN 189, at 24.] Accordingly, the Court cannot say that the jury's assessment of a back pay award in the amount of $81,000 was "clearly excessive." *See Gregory*, 220 F.3d at 443. Marshall was wrongfully demoted roughly five-and-a-half years prior to the verdict, and the jury could reasonably have concluded that $81,000 represented what Marshall would have earned if not for the adverse action she suffered. By Marshall's own testimony at trial, her average salary as a Team Lead in the time leading up to her demotion was $6,260 per month, or $75,120 per year. [DN 176, at 91.] Marshall further testified that, as a result of her demotion back to analyst, her monthly salary was reduced to around $4,310 per month, or $51,720 per year, and that this number later increased to around $60,000. By comparing this reduction in salary against the time period between her demotion and the jury verdict, the Court finds that the back pay award was not "beyond the range supportable by proof," or "clearly excessive." *See Gregory*, 220 F.3d at 443. Therefore, the Court must reject Rawlings's reduction argument with respect to back pay.

Second, Rawlings argues that the front pay awarded by the jury with respect to Marshall's termination claim is inconsistent and warrants a new trial and, alternatively, the $75,000 figure awarded should be reduced to $0 because "[it] is inconsistent and unsupported by

the proof." [DN 211-1, at 45.] Rawlings contends that, due to the fact that the jury did not award any back pay on Marshall's termination claim, "the award of front pay is inconsistent and a new trial…must be granted." [*Id.*] Contrary to Rawlings's contention, though, the mere fact that the jury failed to award Marshall any back pay damages with respect to her termination claim does not mean that the award of front pay for the same is necessarily inconsistent; in other words, that the jury determined Marshall was not entitled to an award of back pay regarding her termination does not mean that she was not entitled to an award of front pay either.

However, Rawlings's alternative argument, that the award should be reduced, holds more weight. Rawlings points to the fact that, at the time of her termination, Marshall was making around $60,000 per year and, at the time of the verdict in this case, she was making around $62,000 per year. [DN 176, at 112, 90.] In Rawlings's view, this means that Marshall's front pay award should be $0, as she stands to make $6,000 more over the next three years (the Court ordered that front pay could extend for three years from the date of the verdict) at her new job than she would have at Rawlings. [DN 211-1, at 46.] Importantly though, Rawlings's argument fails to take into account the fact that the jury found that Marshall had been unlawfully demoted from Team Lead to analyst prior to being unlawfully terminated. Thus, the fact that her annual pay as an analyst at the time of her termination was $60,000 does not ultimately bear upon the analysis. Marshall was making around $75,120 when she was unlawfully demoted from Team Lead to analyst, a figure which represents $13,120 more per year than her current $62,000-per-year salary. Accordingly, while the Court finds the jury's award of front pay in the amount of $75,000 to be "clearly excessive," *see Gregory*, 220 F.3d at 443, Rawlings's proffered amount of $0 is also clearly inadequate. Rather, the logical amount of front pay Marshall should have been awarded in the three allowable years beginning from the date of the verdict is $39,360, which

represents the difference in her average pay as a Team Lead at Rawlings and her current salary, multiplied by three years in accordance with this Court's allowance of front pay.

Third, Rawlings contends that, absent the grant of a new trial, the Court should strike the punitive damages award, arguing that Marshall "did not request punitives in her pleadings and she did not present sufficient proof at trial…." [DN 211-1, at 47.] In support, Rawlings states the following: Marshall "changed the entire theory of her damages on Thursday, March 29th – the evening before the case was submitted to the jury. Neither the Complaint nor the First Amended Complaint requested punitive damages," "[p]unitive damages were not discussed when the parties mediated the case in November 2017," and Marshall's proposed jury instructions omitted any reference to punitive damages. [*Id.*]

However, this Court already ruled, *in limine*, that Marshall would be allowed to present evidence of punitive damages. [*See* DN 146.] At that time, the Court specifically noted that in a pre-settlement conference email in September 2017, Marshall listed as her categories of damages the following: wages (front pay and back pay), emotional distress, and punitive damages. [*See* DN 109-1, at 3 n.1.] The Court also explained that, regardless of her failure to specifically denote the precise amount of punitive damages she sought, pretrial, the Court would permit her to proceed to trial with punitive damages as an option. [*See* DN 146, at 38-39 (explaining that the failure to disclose a precise numerical value "was substantially justified or harmless given the difficulty that comes with trying to calculate these amorphous categories of damages before trial" (compiling cases).] Thus, having already dispensed with Marshall's failure to include the category of punitive damages in her original or amended complaint, the Court sees no reason now to change course and rejects Rawlings' argument on this front.

Rawlings also argues that "the Court should reduce the punitive damages award to $0 since the proof at trial does not support that Rawlings acted 'with malice or reckless indifference to [Marshall's] federally protected rights under the ADA.'" [DN 211-1, at 48 (quoting DN 189, Instruction No. 10.] Essentially, Rawlings contends that Marshall failed to adduce evidence at trial that any of her supervisors or Mr. Rawlings explicitly recognized their duties under the ADA, and then acted contrary to those duties anyway. [*Id.*] Conversely, Marshall argues that the testimony of Kathy Barrens, currently Rawlings' Chief Financial Officer, laid out the fact that all Rawlings employees, including Mr. Rawlings, understand their obligations under federal law, and that Debra Ford, a Human Resources Generalist, testified to company policy concerning harassment, and that the evidence at trial showed a reckless indifference to those policies. [DN 227, at 42-44.] Specifically, Marshall points to Mr. Rawlings' failure to conduct an investigation into Marshall's allegations of harassment and Rawlings' failure to adjust performance metrics for Marshall during her periods of intermittent FMLA leave. [*Id.* at 44.] Rawlings frames the evidence which was adduced at trial and to which Marshall cites in her response as going more towards retaliatory motives and potential FMLA violations rather than disability discrimination under the ADA. [DN 236, at 25.]

Of course, the presentation of evidence in employment cases such as this one often times involves a considerable amount of overlap, and this case has been no exception. And it should not be forgotten that Marshall proceeded on, and prevailed on, the Cats Paw theory. After reviewing the relevant portions of the Record, the Court is satisfied that ample evidence was adduced at trial from which the jury could have concluded that punitive damages were warranted under the circumstances, especially when viewing all evidence in the light most favorable to Marshall, as this Court is required to do. *See Gregory*, 220 F.3d at 443. Under this standard, the

Court cannot say that the award of punitive damages was "clearly excessive, resulted from passion, bias or prejudice," or that it was "so excessive…as to shock the judicial conscience of the Court." *Id.* Accordingly, the award must stand.

### E. Conclusion

For the reasons stated in this Memorandum Opinion, and the Court being otherwise sufficiently advised; **IT IS HEREBY ORDERED** that Rawlings' Motion, [DN 211], is **DENIED.**

**IT IS FURTHER ORDERED that the jury's award of front pay to Marshall on her claim of ADA discrimination relating to her termination SHALL be reduced to $39,360.**

**IT IS SO ORDERED**.

cc:     Counsel of Record